## The Commercial Bank of Buffalo v. Kortright.

An action of *assumpsit* lies against a corporation for *refusing* to permit a transfer of stock upon its books; and the measure of damages is the full value of the stock at its highest price at any time between the refusal and the *commencement of the suit.* *Quere.* Might not the time have been extended to the *day of trial?*

A *blank transfer* of a certificate of stock, where the holder has affixed his *name* and *seal* upon the back of the certificate is valid; and the transferee is authorized to fill it up by writing a transfer and a power of attorney over the signature.

Proof of *custom* as to the *mode* of transferring stock is admissible.

A *corporation* is bound by the acts of its acknowledged *agents* in the common transactions of the corporation, although the *appointment* of the agents be not evidenced by the records of the corporation.

A transfer of stock in a monied corporation is good *as between the vendor and purchaser* although not registered in the transfer book of the corporation, notwithstanding a statutory provision, that no transfer shall be valid unless so registered; the evidence of right to the stock as between the parties themselves not being within the purview of the statute.

A *principal* is bound by the act of his *agent* in disposing of his property where the latter is furnished with the external *indicia* of right to dispose of it, notwithstanding that he may have deviated from the secret instructions of his principal.*

ERROR from the supreme court. Kortright brought an action of *assumpsit* against the Commercial Bank of Buffalo, for the refusal of the bank to permit a transfer to be made upon its books of 100 shares of stock, standing there in the name of *Pierre A. Barker.* On the first of October, 1834, Barker being the holder of a certificate of stock, signed by the cashier of the Commercial Bank of Buffalo, stating that he was entitled to 100 shares, of the value of $100 each, in

---

* The CHANCELLOR, who delivered a dissenting opinion in this case, *holds*, that where the charter of a monied corporation contains a provision that no transfer of its stock shall be valid, unless registered in the books of the corporation, that an unregistered transfer does not convey the *legal title* to the stock, but merely confers an *equitable interest* in it, and that, subject to all previously existing equities. He *further holds*, that the plaintiff was not entitled to sustain an action at law, and that if such action did lie the utmost extent of the plaintiff's claim would be for the *depreciation in the value* of the stock.

the capital stock of that bank, transferable only on the books of the bank by Barker, or his attorney, on surrender of the certificate—sent the certificate, together with his promissory note for $10,000, as collateral security to one *Bartow*, who was at that time cashier of the commercial Bank at Albany, to obtain a loan of $10,000. Before transmitting the certificate of stock, he *endorsed* upon it his name, to which he attached a seal. On the second day of October, 1835, at the city of New-York, an agent of Bartow negotiated the certificate of stock above mentioned, and other stocks, by delivering the same to the plaintiff, from whom he obtained a loan of $25,000. The plaintiff gave a receipt for the stocks promising to return the same on repayment of the $25,000 with interest, on demand, after thirty days from the date of his receipt. Bartow absconded on the day that the plaintiff advanced the money, and the latter filled up the blank transfer, by writing over the name and seal of Barker an assignment, transferring the stock to himself, and constituting S. A. Sherwood, attorney, to do all necessary acts to perfect the transfer. On the second of November, 1835, Sherwood went to the bank at Buffalo, and requested permission to transfer the stock, which was refused by the original stockholder, who was then acting as president of the Commercial Bank, on the ground of apprehended difficulty in respect to the *note* for $10,000, which had not been transferred to the plaintiff. On the trial, however, it appeared that Barker had obtained possession of the note, and that this suit was probably defended for the benefit of the Commercial Bank of Albany, who claimed that Bartow had gone off their debtor to a large amount. When Barker refused to permit the transfer on the books of the bank, he conceded that he had received the $10,000 of Bartow, and offered to pay that sum to Sherwood, which was declined to be accepted. It was proved, that from *January* to *June*, 1836, the stock of this bank ranged as high as from 150 to 300 per cent. advance. A witness for the plaintiff testified, that he was acquainted with the business of trans-

ferring stocks, having been in that business twenty years, and that it was the universal usage in the city of New-York, and in other places, to transfer stocks by blank endorsements, or blank powers of attorney ; that he had been in the habit of transferring in this manner stocks of nearly all the states of the Union, and that stocks are frequently sent in like manner to England ; to this evidence the defendants excepted. The judge charged the jury, that the plaintiff was entitled to recover, and that the rule of damages was, the highest price that the stock bore at any time *after* the demand for permission to make the transfer on the books of the company, and *before* the commencement of the suit. The defendants also excepted to the charge of the judge, and the jury found a verdict in favor of the plaintiff for $13,536,35.

The defendants applied to the supreme court for a new trial, which was refused, and judgement rendered for the plaintiff. The defendants thereupon sued out a writ of error. See the opinion of the chief justice delivered in the supreme court. 20 *Wendell*, 93, *et seq.* The case was argued in this court by

*J. Van Buren & S. Stevens*, for the plaintiffs in error.

*S. Sherwood & D. B. Ogden*, for the defendant in error.

After advisement, the following opinions were delivered :

By the CHANCELLOR. The first objection to the right of the plaintiff below to recover against the bank is, that there was not a sufficient *demand* of the right to transfer the shares on the books of the bank. This objection is as to a mere matter of from, and clearly is not well taken. Although Barker, as the owner of shares standing in his name on the books of the company, but which he had made an equitable hypothecation of to secure the payment of the note to Bartow had a personal interest to protect, he was still the *president* of the bank ; and if Kortright was entitled to an absolute transfer of the stock to himself upon the

books of the corporation, notwithstanding the objection of Barker in his individual capacity, I have no doubt that the demand made of him at the bank as the president of the company, was a sufficient demand upon the corporation. An individual who is bound to make a formal demand, is not obliged to hunt up the directors of a corporation for the purpose of having some one appointed who is authorized to comply with his legal demand. It is sufficient for him to apply at the bank during the unsual hours of business, and make his demand upon the officers and clerks who may be in attendance there ; and in case they are not authorized to transact that particular business, they must either refer him to the proper officer in the bank, or procure the attendance of such officer, or of the board of directors, if necessary, without any unreasonable delay. The transferring the shares of the capital stock on the books of a bank, is a matter of ordinary occurrence ; and in the absence of any proof to the contrary, it may be fairly presumed that the principal officer of clerk in attendance at the bank, during the usual hours of business, is authorized to permit such a transfer when proper. In the case of *Kirton* v. *Breathwaite*, 1 *Mees. & Wels.* 310, 2 *Gale's R.* 48, *S. C.*, where an attorney wrote to a debtor that unless payment of the demand due was made at his office by a particular day a suit would be commenced, it was held that a tender to the clerk of the attorney at the office, in the absence of the attorney, was a good tender, although the clerk had no special direction to receive the money ; that the letter authorizing the money to be paid at the office, contained an implied authority to the clerk having charge of the office, in the absence of the attorney to receive the money. The charter of the bank in the present case, having authorized the owners of stock to sell and tranfer it on the books of the corporation, it is the duty of the directors to see that some proper officer of the institution, usually in attendance at the bank, is duly authorized to allow such transfer when proper to be made ; and it is no excuse to say that they have neglected that duty, or, that when a demand was made at the bank, the persons in attendance there neglected to inform

the person making the demand, who was the officer or clerk to whom that particular duty had been assigned.

As important principles are involved in this case, I shall pass over the second point, which is also a question more of form than of substance; though I have great doubts whether the letters of Tillinghast were not written as the attorney of Barker in his individual character merely. If so, they clearly were not evidence against the bank, notwithstanding Barker was one of its officers. Neither shall I expresss a definitive opinion upon the question whether a corporation is bound at its peril to settle the conflicting claims of third persons to shares of its capital stock, where the person in whose name the stock is standing denies the right of another who claims to be his attorney to transfer it; even if such was proved to be the law by the custom of Wall-street.

The twenty-seventh section of the act incorporating this company, declares in express terms that no transfer of any stock in the corporation shall be valid, until such transfer shall have been registered in a book to be kept for that purpose by the directors of such corporation. *Statutes of 1834, p. 265.* Proof of a custom of Wall-street, or even of a general custom, to make a transfer of stock by a blank endorsement upon the scrip issued by the corporation, cannot, therefore, make that a legal transfer which a public statute has declared shall not be valid until it has been duly intimated upon the books of the corporation. As well might a custom to take three per cent. per month, or more or less than that sum, according to the pressure in the money market in Wall-street, be received as evidence that such an agreement was valid, notwithstanding the usury laws, and I have no doubt such a custom might be as easily proved as the custom in question here; as both depend upon the usages of brokers. In the case of *Stebbins* v. *The Phœnix Fire Ins. Co.* 3 *Paige's R.* 350, I had occasion to examine the question as to the legal effect of a transfer of stock not intimated upon the books of the company, where by the charter of the corporation a transfer, or registry of the transfer upon the books of the company was necessary to

Com. Bank of Buffalo v. Kortright.

make such transfer valid ; and I then arrived at the con-
clusion that by such a transfer the assigneee did not obtain
a legal title to the stock, but merely an equitable lien ; sub-
ject to all prior equities which existed in favor of any other
person from whom such assignment was obtained. Indeed
it would be impossible to give any other effect to such a
transfer without rendering the provision of the statute a
dead letter. A similar decision was made by the supreme
court of the United States in the case of the *Union Bank of
Georgetown* v. *Laird, 2 Wheat. R.* 391. And in the case
of *The Marlborough Manuf. Co.* v. *Smith, 2 Conn. R.* 579,
where the stockholders were personally liable for the debts,
the supreme court of Connecticut held that an absolute
transfer of stock not intimated upon the books of the corpo-
ration, was not a legal transfer, and did not make the as-
signee a stockholder of the company so as to render him li-
able for its debts. Indeed the legislature of this state when
they wished to restrain the negotiability of the certificates
of deposit of *The New-York Life Insurance and Trust Com-
pany,* so as to prevent them from forming a part of the cur-
rency or circulating medium of the state, supposed it to be
merely necessary to insert a provision in the act of incorpo-
ration that such certificates should only be transferable on
the books of the company, according to such regulations as
the directors should establish, in the same manner as the
stock was made transferable. I recollect distinctly of be-
ing applied to by a committee of the senate on the subject,
(as the principal object of the legislature in granting that act
of incorporation was to provide a safe place for the invest-
ment of funds belonging to suitors of the court of chancery,
and of infants whose funds were under the protection of
that court, and of the surrogates,) and that this amendment
was inserted for the express purpose of preventing a custom
of Wall-street or any other custom, making that negotiable
by a blank transfer, which the legislature had determined
should not be negotiable by mere endorsement or delivery.
*Statutes of 1830, p.79* § 16. And for this reason, when I
was subsequently applied to by the company to allow them
to modify their by-law on this subject, in relation to stocks

and certificates held abroad, I consented to it only upon condition that it was confined to transfers made abroad, and that such transfers should be intimated upon the books of the company's agent in London, at the time of the transfer; and that transcripts of such transfers should be sent and entered upon the books of the company here. *See By-law of 5th December*, 1837. It is not probable that such an application would have been made, or the by-laws altered by the directors of the corporation, one of whom is now a distinguished member of this court, if they had supposed a custom among brokers and money dealers was paramount to a positive law of the state.

As a general rule, the court of chancery will not interfere to compel a specific performance of a sale of stock. But an agreement to transfer certain specified shares, founded upon a good consideration actually paid therefor, or an actual hypothecation thereof for the payment of a specified debt, but not intimated on the books of the company, although it does not transfer the legal title to the stock, is a good equitable transfer or hypothecation thereof, which will give to such assignee a preferable claim over any person who has not a prior equity, unless he has obtained a legal title to the stock by an actual assignment upon the books of the corporation without notice of such equity. This is upon the maxim that where the equities of the parties are equal, and neither has a legal title, he who is first in time is strongest in right. *Qui prior est in tempore, potior est in jure.* And as the delivery of the scrip to Bartow with a blank endorsement thereon, to secure the payment of Barker's note, gave to him an equitable lien upon this stock to that extent, so the subsequent delivery of the scrip to Kortright, for the security of Bartow's debt to him, transferred an equitable interest to the same extent, as a pledge not merely of the stock but also of the $10,000 note for which Bartow held the scrip in security. I have no doubt, therefore, as between Kortright and the Commercial Bank of Albany, or any other creditors of Bartow, that the equity of Kortright is the strongest; the legal title to the stock being

ctill in Barker, so that neither of the claimants under Bartow has any legal title to the same.

I am satisfied, however, that Kortright mistook both his legal and equitable rights, in supposing that he was entitled to have the stock transferred to himself upon the books of the corporation, and that the supreme court was clearly wrong in supposing that he was entitled to recover against the plaintiffs in error the full value of' that stock, in an action of assumpsit for refusing to permit a transfer, when Barker who had hypothecated the stock to Bartow tendered the agent of Kortright the whole amonnt for which it was pledged. The case of *Kirton* v. *Breathwaite*, to which I have before referred for another purpose, shows that if Sherwood, the agent of Kortright, was authorized to demand a transfer of the stock on the books of the company, upon the ground that the money for which it had been equitably hypothecated by Barker was not paid, a tender to him of that money was good so as to make it the duty of the bank to refuse to permit the transfer when that tender was not accepted. Although Barker, from the situation in which he was placed as president of the bank, and as the individual owner of the stock, was necessarily obliged to act in both capacities, his different acts must be referred to his rights and duties in each capacity, in the same manner as if some other person had been present as the financial officer of the bank, while he was attending to his individual rights merely. The tender must, therefore, be considered as having been made by him individually, and that tender being refused, the bank would have been liable to him personally, if it had, without his consent, permitted his stock to be transferred to another person under the instrument and power upon the scrip, which, as he truly stated, had been filled up, as an absolute sale of the stock, without authority.

The case of *Rex* v. *The Bank of England*, 2 *Doug.* 524, referred to in the opinion of the chief justice, is not an authority to show that an action of *assumpsit* will lie in this case, even if Kortright was entitled in equity, as against Barker, to have the stock transferred to himself absolutely. By referring to that case, it will be seen that the suit was

brought by the legal owners of the stock : not for refusing to permit them to have the stock transferred to themselves, but for refusing to permit them to transfer the stock to some other person. They were the executors of the executor of the decedent, in whose name the stock stood upon the books of the company, and the legal title was therefore in them by operation of law. I am not prepared to say there is not an implied agreement between a corporation and its stockholders, that they shall be permitted to transfer their stock upon the corporation books, where such a transfer is necessary to complete the title of the purchaser, as the effect of such a refusal might deprive the owner of the stock of the power of selling it for its full value. But an executor who holds the legal title, certainly has no right to insist upon transferring the stock into his own name. In the recent case of *Hopkinson* v. *Roe*, 1 *Beawan's R.* 183, Lord Langdale, the master of the rolls, refused to allow executors the expense of such a transfer, as wholly unnecessary and improper : saying that they should not transfer the stock to themselves, but should transfer it directly from the name of the testator to the legatees, or to the purchasers to whom they might sell it in discharge of their trust. The case of *Gray* v. *The Portland Bank*, 3 *Mass. R.* 364, was an action of *assumpsit,* founded upon the duty which the bank owed to the plaintiff as legally entitled to an issue of the new stock which the corporation issued to another person, and received payment for ; and I will not say assumpsit was not the proper action under the circumstances of that case. But in *Sargeant* v. *The Franklin Ins. Co.* 8 *Pick. R.* 90, as there was no legal privity between the corporation and the plaintiffs, who had not obtained a legal title to the stock, I think *an action on the case* was the proper remedy. In that case there was no dispute between the owner of the stock and the plaintiffs, and as the corporation was guilty of a very unjustifiable attempt to defeat the sale and transfer, by causing the stock to be attached and sold for its own debt, after full notice of the equitable right of the plaintiffs, I think the defendants ought to be liable in some form of action. So in the present case, if the bank, after it had no-

tice of the equitable lien of Kortright upon this stock, to the extent of the money loaned by Bartow to Barker and the interest thereon which had not been actually paid, had suffered Barker to transfer the stock standing in his name to a *bona fide* purchaser, or to receive the dividends thereon, so as to deprive the plaintiff of the power of enforcing that equitable lien by a resort to the proper tribunal for that purpose, I am not prepared to say *an action on the case* would not have lain against the corporation for the injury the plaintiff had sustained by such a breach of duty. But as the plaintiff was not entitled to an absolute transfer of the stock to himself in this case, under any circumstances, without the consent of Barker, the pledgor, and had only the right to have the stock sold at a fair price in the market, if Barker refused to pay the money justly due from him and thereby to redeem the pledge, the bank was guilty of no fault in refusing to suffer a transfer by either party until their conflicting claims were settled by an amicable arrangement, or by the decision of a tribunal which had the power and jurisdiction to do justice between the parties, and whose decree would protect the bank against the future claims of either party.

Where there is an absolute sale of stock accompanied by a blank endorsement of the scrip, or a blank power of attorney to enable the purchaser to obtain a transfer of the legal title upon the books of the corporation, I have no doubt of the right of the purchaser to fill up such blank in such form as to carry into effect the intention of the parties. That, however, does not depend upon local custom, but upon the settled law of the state in relation to commercial contracts, as declared by the decisions of the supreme court in *Nelson* v. *Dubois,* 13 *Johns. R.* 175, and *Campbell* v. *Butler,* 14 *idem,* 349 : which decisions were in accordance with an opinion which Mr. Justice Spencer had previously expressed in *Herrick* v. *Carman,* 12 *idem,* 161. Although those cases related to mere guaranties, yet the principle is the same when applied to a case of this kind, as a seal is not necessary to authorize a transfer of stock on the books of a corporation where such transfer can be legally made without a seal

But the case last cited is an authority to show that such a blank cannot be filled up so as to give to the writing a legal effect contrary to the intention of the parties. In this respect the effect is different from an endorsement in blank upon a negotiable note, or a blank signature or acceptance which is so made as to enable the person in whose hands it is placed to impose upon the community, by an apparent right to the instrument written over the signature, as the legal owner of a negotiable security. The distinction between an instrument which upon its face transfers a legal title, and one which only transfers an equitable right, is clearly settled. In the latter case, the party who takes a transfer which upon its face only conveys an equitable title to the person from whom he receives it, or only conveys such a title from the latter to himself, takes it subject to all equities which existed against it in the hands of the person from whom he received it. Here the scrip on its face showed that the stock was transferable only on the books of the bank. Kortright, therefore when he received the scrip from Bartow's agent with this blank endorsement thereon, had full notice that he only obtained an equitable pledge of what was a mere equitable interest in Bartow; and of course he took it subject to every equity which existed against it in favor of Barker or any other person to whom the stock had previously been equitably assigned or pledged; and if he neglected to make the proper inquiries at the bank, or of Barker, in whom the legal title to the stock still was, it was his own fault.

The stock was not sold to Bartow but was merely pledged for the security of the $10,000. He therefore had no legal right to fill up the blank with an absolute sale to himself, and a power to transfer it on the books of the bank absolutely. If the debt was not paid, he probably had a right to sell the equitable pledge to a third person, after due notice thereof to Barker; and he might then, perhaps, have been authorized to fill up the blank with an absolute sale to such purchaser and a power to transfer the stock to such purchaser on the corporation books, as that would be according to the legal effect of the agreement inferred from

the pledge of the certificate with such blank endorsement. The pledgee, however, who is the trustee to sell in such a case, and whose duty it is to make the pledge produce the highest price, ought not himself to become the purchaser, unless the pledge is sold under the direction of a court of competent jurisdiction, and by an officer who is competent to protect the rights of all parties on the sale. It appears to be settled that the pledgee may assign over the pledge to another, but the assignee in that case takes it under all the responsibilities of the original pledge. 2 *Kent's Comm.* 579. I have no doubt, therefore, that this certificate of stock, to the extent of Bartow's interest therein, was equitably pledged to Kortright; but as the transfer to him was merely as a pledge to secure Bartow's debt, he had no right as against the attaching creditors of the latter to the absolute title, but should have sold the pledge upon due notice to them as well as to Barker, and out of the proceeds of the sale he should have paid Barker the surplus, if any, beyond the amount due to Bartow on the note; and of that amount he would have the right to retain the whole or so much as was due from Bartow to him.

Even if there had been a right of action against the bank, the rule of damages adopted by the circuit judge was clear- ly wrong. The supreme court has been misled by the two cases cited from the *Massachusetts* reports; probably from the neglect of counsel to notice the fact that in those cases the plaintiffs had been absolutely deprived of the power of ever obtaining their stock, or the dividends thereon, by the fault of the corporation. In *Gray* v. *The Portland Bank,* the stock had never been issued to the plaintiff, but the bank had issued it to another person who had paid for the same and obtained the legal title upon the books of the corpora- tion. The damage the plaintiff had sustained in that case, therefore, was the *full value* of the stock at the market price, And in *Sargeant* v. *The Franklin Ins. Co.* the situation of the parties was substantially the same, as the corporation not only refused to permit the stock to be transferred, but had caused it to be attached and sold as the property of the person in whose name it stood, to satisfy a debt due from

him, and had thus received the proceeds and transferred the legal title to the stock to the purchaser. But in the present case the refusal of the bank to permit the stock to be transferred, even if Kortright had a legal right to the same, did not divest that right or impair his title to such stock, nor can the recovery against the corporation give them any right to the stock or to retain the dividends thereof against the real owner. The plaintiff may still file a bill against Barker and the bank, to have a sale of the pledge and to compel the bank to allow a transfer of the stock to the purchaser. The bank is not the owner of the stock by the recovery in this suit, as it is not authorized, either directly or indirectly, to reduce its capital by becoming the purchaser or owner of its own stock. It is even prohibited by law from receiving it as a security upon any loan or discount. The extent of the damages sustained, therefore, even if the plaintiff had been the absolute owner of the stock, would have been the depreciation in value, as the stock and the dividends would still belong to him.

For these various reasons I think the judgment of the court below was erroneous, and that it should be reversed, and a *venire de novo* be awarded.

By Senator VERPLANCK. Let us examine separately such of the prominent points in this cause as bear on the merits of the controversy, or the legal principle governing similar affairs.

I. Supposing the assignment and power of attorney on the stock certificate to have been legally executed, was the plaintiff below entitled to a transfer of the stock? *Bartow,* as appears in the evidence, was entrusted by Barker with the certificate of this stock for the purpose of borrowing money on its security. The certificate was accompanied with such an authority to transfer (now presuming that authority to be valid,) as would hold out Bartow, to any one to whom he might apply for a loan, in the character of an agent having full right to transfer, or to substitute some other person as the attorney for that purpose. Bartow does not appear himself the pledgee, (for then the power would

Com. Bank of Buffalo v. Kortright.

have been made out to him immediately,) but as an agent empowered to obtain money on a pledge of stock. The precise use Bartow was expected to make of the stock, and the different use he may have actually made, were nothing to the purpose, as against those who acted upon the faith of the general authority entrusted to the holder of the certificate and its blank endorsements. " So far as the agent, whether general or special, is in any case held out to the public at large or to third persons dealing with him, as competent to contract for or to bind the principal, the latter will be bound by the acts of the agent, notwithstanding he may have deviated from his secret instructions, and orders, for otherwise such instructions and orders would operate as a fraud upon the unsuspecting confidence of the other party." *See Story on Agency*, § 127, 133, *and especially the well reasoned distinctions and explanations in note 1, p. 117, and note p*, 118, 119, *and authorities there cited.* The intent of Barker and his understanding with Bartow were, that the stock should be used as a security for a loan of $10,000 for himself. But he held out Bartow, or whomsoever he might substitute to himself, as authorized to make any disposition of the stock whatever. Bartow was intrusted with what Lord Ellenborough, in a well known leading case on the law of agency, 15 *East,* 44, expressly terms, " the usual external *indicia* of the right of disposing of the property." On the faith of these external *indicia,* Kortright lent $25,000 upon the agregate security of this and other stocks. If the law should now hold this transaction to be void, it would, indeed, as Judge Story says, " operate as a fraud upon the unsuspecting confidence of the other party." If the holder of of the certificate and the power has been voluntarily exhibited to the money dealing public, as having the competent right of pledge disposal and transfer vested in him by means of all the usual and well known evidences of such right, the private understanding of Barker and Bartow, and the former supposition that the stock was to be or was pledged in a manner different from that which actually took place, cannot affect the rights of those, who, if misled, were misled by Barker's own acts.

Much stress is laid upon the enactment in the bank charter, that "no transfer shall be valid, unless such transfer shall have been registered in a book kept for that purpose by the directors." Does it then follow that Kortright had not a legal title to the stock, such as he could assert by suit, the transfer not being yet perfected, or, in the words of the charter, "*valid.?*" This provision of the charter is evidently for the protection of the bank in the payment of dividends; for the ascertaining the legal voters at its election; and finally as appears from the comparison of the charter with the general regulations of our monied corporations, for preventing, in case of corporate bankruptcy, the escape from liability to contribute for the deficiency. Such a provision does not interfere with the rights of ownership, as between the person in whose name the stock may stand and his vendee or pledgee. The title might be perfect as between them, and yet not valid as to any other liability or right which was meant to be protected by this legal evidence of transfer on the books.* Such legal evidence, it is made the bank's duty, by operation of law as well as by its own express understanding in its certificates to furnish to the person entitled to the possession, whenever he has complied with the conditions prescribed to show that right. The bank sets forth those conditions in its stock certificate. It there states to the world the terms upon which that valid and perfect title shall be furnished; the shares are there made transferable only "on the books of the bank by the said stockholder, or his attorney, on surrender of the certificate." When the evidence of the certificate and the power of attorney has been produced as required, (and that evidence furnished by the prior stockholder himself,) how can either the bank or that stockholder be at liberty to deny the legal obligation of making a formal transfer on the books? The bank was previously at liberty to require by its bylaws and certificate other evidence; it might have required

---

*This question arose in the *Bank of Utica* v. *Smalley*, 2 *Cowen*, 770, and it was *held* that a similar provision in the *act of incorporation* of the Bank of Utica was *intended exclusively for the benefit and protection of the bank*. See also *Gilbert* v. *Manchester Iron Manufacturing Company*, 11 *Wendell*, 627.

that the transfer should be made only by the former owner in person or by his oral assent. The directors have not done so; they made other conditions, and must stand by them. To restrict directly or indirectly the right of having a transfer on the books, to those who in addition to the *prima facie* proof of property, can show an undisputed ownership in themselves, and not merely a qualified right or interest, would be contrary to the intent of the charter, the necessities of business, and even to reason and justice. It would cut off trustees and assignees, as well as prevent the common and very convenient practice of *bona fide* stock loans! The subsequent refusal of the stockholder, who has sold or pledged such stock and given a power of attorney to transfer, to perfect his contract, or his inhibition of the transfer, cannot lessen the obligation of the bank to comply with its own rules, its express understanding and its legal duty.

II. Barker is a party to the transaction on his own account. He is also president of the bank. Was that legal proof that he had authority to act for the bank in this behalf, there being no evidence of any formal delegation to him of authority by the vote of the directors? If he had no authority to act on behalf of the bank in relation to the transfer, then the refusal was on his own account alone, and the action against the bank must fail. This difficulty would have been formidable, it might perhaps have been insuperable, in the days of Lord Coke or of Hale. But the old law of corporate delegation has been modified by the customs and wants of modern commerce. It is in evidence from the cashier, that " the *president* or the *cashier* permitted transfers." Barker appears to have been at the banking house as president, and to have there acted for the bank as well as on his own business. The bank, in defending this very suit, has ratified his acts, which might have been disavowed. If, as president, Barker was in the habit of permitting transfers, or if the board has ratified his acts, the directors cannot now reject him as their agent and representative, " As the appointment of an agent may not always be evidenced by the written vote of the directors, it

is now the settled doctrine, *at least in America*, that it may be inferred or implied from the adoption or recognition of the acts of the agent by the corporation or its functionaries. Thus, if a cashier of a bank should openly act as such in the common transaction of the bank, with the full knowledge and assent of the directors, his acts would be obligatory upon the bank, although there might be no written vote or record to establish his appointment." 12 *Wheaton* 64, 74. *Story on Agency*, § 52.

III. The power of attorney to transfer, &c. was made in *blank*, by the owner placing his name and seal with the subscription of a witness upon the back of the certificate, which was sent for the purpose of having a power written above the name and seal, to any person who might advance money on its security, to whomsoever he might direct: was that power valid when thus written? This objection, like the last, would have been more formidable in England a century or two ago, than it is now in this country. Evidence was given, that this was the customary mode for years, of transferring stock in our great stock market of New-Nork, as well as elsewhere. Such a custom certainly could not vary the settled law, if that pronounced a deed or other sealed instrument to be void when written and executed in this manner, but the evidence of custom is good not to contradict or change the law, but to explain the meaning and intent of parties in contracts: as here, to show Barker's understanding and design in regard to the authority he gave. Judge Edwards at the trial, stated its effect with precision. He said that "the testimony was legal proof not to vary the law, but to show Barker's intention in thus executing an instrument in blank." I will not repeat what I have elsewhere said, as to my view of the nature and effect of evidence of commercial usage. *See S. & M. Allen* v. *Merchants' Bank, ante, p.* 215. But does not this custom whatever may have been Barker's intent, vary or contradict the settled general law? It might have done so in older times when the authority of the rule in *Sheppard's Touchstone* and in *Perkins*, (as cited and relied upon in the argument,) was still paramount. It was then held that if a

man write his name and affix his seal to a blank paper, and give direction to another to write a deed over it, and such other write such deed, it is nevertheless *no deed*. I say this *might* then have been fatal; but at a very early day, the strong equities of special cases sometimes compelled courts to break through the rule,' and as long ago as the 40 of Elizabeth, when in a bond given *pour le sauver harmless*, i. e. for indemnity, a blank was left to insert the christian name, which was filled up after execution by consent of parties, the bond was held good. If, however, we leave the antiquarian part of the law and come down to a state of society like our own, we shall find the more rational doctrine well established. The case of *Texira* v. *Evans*, before Lord Mansfield, was, I think, the first where the doctrine was clearly and broadly applied. 1 *Anst. R.* 229. Evans wanted to borrow £4000, or as much of it as could be raised on his security. He executed a bond with blanks for the name and sums, (certainly the most material parts, thus being in blank,) on which *Texira* lent half the desired sum, and the agent filled up the bond with his name and that amount; this bond was held to be good. Some years after, Judge Wilson, in *Addis* v. *Baker*, 1 *Anst. R.* 229, says: " On navy bills which are not in their nature negotiable, the common practice is this : a letter of attorney to receive the money (which is a deed under seal,) is made out in blank for the name. This is always sold with the navy bill, and thus they are negotiated from hand to hand, till any purchaser chooses to fill up the blank with his own name." The decision of the case was in conformity with these views. On the foundation of these cases and the corresponding usage in this country, the courts here and in other states, have made many analogous decisions. Thus, in 4 *Johns. R.* 54, it was held that a deed might be altered in a material part, by consent of parties, and more recently by our supreme court, that bonds executed in blank with parol authority to fill up and deliver them, were valid. 6 *Cowen*, 60, *and* 8 *id.* 118. So in *Knapp* v. *Maltby*, 13 *Wendell*, 587 the instrument was signed and sealed by the party, and the authority given, was to make certain material alter-

ations on it: this was held valid.    See also 5 *Mass. R.* 536. Those familiar with the business of our custom houses, well know that the usage of executing bonds in blank is of daily occurence there, and this is unquestionably done with the sanction of the legal advisers of the U. S. nor has the validity of such bonds ever been questioned.   Now the writing of a whole power to transfer, with verbal or implied authority to do so, above a seal and signature on the back of a stock certificate, where nothing else could with any propriety be possibly written, is a far smaller excuse for delegated authority, than where the name of a party is inserted, or still more the sum for which he is to become bound.   There the responsibility that the agent may impose upon his principals is unlimited.   Here it is confined to the hundred shares of stock, with the latitude of inserting one name or another as the vendee, pledgee or the attorney.

IV.  Is the rule of damages applied by the jury correct? If the estimate, of the rights and character of the parties to the transaction, above taken be correct, then the rule of damages laid down by the chief justice appears to me to be equally so.   If the bank be bound by the acts of Barker as its President ;  if Barker be bound by that evidence of authority to transfer his stock which he voluntarily held out to all who might deal with his agent, then the pledge to the plaintiff below of this stock with others for a larger amount than the sum intended by Barker, gave to such a pledgee a perfect right to the possession of his security, and all the legal incidents which follow such possession.   If he was prevented from realizing or securing his debt by the bank's refusal to allow the transfer, the bank must be liable for the highest price of the stock at any time after the demand and before trial.   Our supreme court, in 3 *Cowen*, 84, quoted and adopted the rule of Judge Grose in 2 *East*, 211 ; " the true measure of damages in all these cases is that which will indemnify the plaintiff for the breach."   In 9 *Cowen*, 697, Judge Sutherland, in a *per curiam* opinion, comes to the conclusion, that " if the plaintiff without unreasonable delay prosecute the suit, we think it just that the fluctuations in price be exclusively at the hazard of the defendant,

the plaintiff having done every thing in his power to have the contract settled, and which is prevented only by the default of the defendant. In such a case the plaintiff is entitled to the highest price between the day when the delivery should have been made and the day of trial." It is true that this rule relates primarily to express contracts of sale, but the reasons apply with equal force to, and have always governed actions in any form, (trover, assumpsit or case,) where compensation in damages is claimed for refusal to deliver, or illegal conversion of any thing, to the property or possession of which the plaintiff is lawfully entitled. In this case, according to judge Grose's rule, the highest measure of damages can hardly indemnify the plaintiff below, as it seems that the whole amount of stock pledged is not sufficient to secure his loan of $25,000.

The action for damages is a convenient common law remedy by a civil suit for what otherwise would have to be sought by *mandamus* to direct the transfer; so that the damages are the substitute for the stock itself, and should be of the value of the highest security it afforded, or at least the highest within the amount of the debt for which it was pledged. *See Dougl.* 523. It has been argued that the plaintiff below is still the owner of the stock, and can claim no damages beyond the loss sustained by its fall in price. Not so—the bank has denied that the plaintiff is the owner. He himself, by the election of this action and the acceptance of the amount he recovers, will waive his right to the stock, and signify his assent to accept compensation or damages instead. Such recovery will be an effectual bar to any further claim to the stock itself. It is analogous to the case of a recovery in *trover*, where when the suit and the damages are not for the temporary detention but for the actual conversion, the conversion is so far ratified by the judgment as to pass the right of property to whomsoever may be the holder in consequence of such tortious conversion. " Judgment in trover for a permanent conversion, say the books changes the property unless it should be made to appear that the damages were given for a temporary conversion merely, not for the value of the thing itself." *Bull. N. P.*

49. *Gilbert's Law of Ev.* 265. *Stark. Ev. pt.* 4, *p.* 1508. Here the action and the evidence supporting it are for the value of the stock itself, and that evidence shows that Kortright's actual damages incurred by the refusal to transfer are quite equal at least to the highest value. If the bank has not been indemnified by Barker, or whoever else may have an interest in the matter, as is the ordinary course of things under such circumstances, it will, I presume, upon payment of the judgment, be entitled to receive from Barker the amount of the loss incurred by a refusal to transfer, made at his request and for his advantage. The loan was honest and friendly, and as one of the two parties Kortright or Barker, one or the other, must ultimately suffer, the true enquiry will be that which Judge Buller says " is the common question every day at Guildhall, when one or two innocent persons must suffer by the fraud or negligence of a third— which of the two gave credit ?" Here Barker trusted Bartow and enabled him to gain credit from others, and whoever stands in Barker's place takes his responsibilities. On the other hand, to what did Kortright gave credit ? First, to the bank, its certificate and the forms of transfer there held out; second, he trusted Barker's name and seal, duly attested and signed to paper written by his authority. Who of these parties ought to suffer ?

Judge Edwards' charge I think incorrect in one point only, that Barker would have a claim against Kortright for any sum recovered by him against the bank, beyond the ten thousand dollars for which the stock was meant to be pledged. I regard the pledge as good for any amount that Bartow obtained on it, so, that Kortright was entitled for himself to such damages as would make him whole, within the limits of the highest market price of the stock. But this does not affect the verdict, which has rendered substantial justice, and I would not disturb it, unless the legal difficulties were far more serious than those presented here. The Judgment should be affirmed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows :

*In the affirmative:* The CHANCELLOR, and *Senators* CLARK, DICKINSON, POWERS, WAGER—5.

*In the negative:* The PRESIDENT of the Senate, and *Senators* FURMAN, HAWKINS, HULL, HUNTINGTON, JONES, H. A. LIVINGSTON, MAYNARD, NICHOLAS, PECK, SKINNER, STERLING, VERPLANCK, WORKS—14.

Whereupon the judgment of the supreme court was AF-FIRMED.