THORP *v.* WOODHULL, Receiver of The Triton Insurance Company.

A subscriber to the capital stock of a corporation to whom shares were awarded by the commissioners, on its being filled up, secured the payment of the par value of his shares, by a bond and mortgage. The shares were thereupon placed in his name in the books of the corporation, and entered to his credit in the stock ledger. The corporation subsequently refused, on invalid grounds, to issue to him scrip for the stock, or to permit him to transfer the stock upon the books of the institution.

*Held*, that this proceeding did not render the bond and mortgage invalid, or entitle the mortgagor to have them delivered up for want or failure of the consideration. His remedy is by an action at law.

By the entry of the stock in his name and to his credit in the books of the corpora‑ tion, the mortgagor became entitled to all the rights and privileges of a stock‑ holder, and thereby received the stipulated consideration for his bond and mort‑ gage.

The agreement upon which the securities were given, was executed and at an end.

By the charter, five per cent. of the amount of each share subscribed, was to be paid on subscribing. The commissioners who received the subscriptions, accepted in lieu of money, the check of the mortgagor's agent, and it was not paid. It did not appear that they received any other checks, nor but that this one was taken in good faith. *Held*, that the principal could not object that the acceptance of the check was illegal and avoided his bond and mortgage.

April 17 ; June 20, 1844.

THE Triton Insurance Company was incorporated on the 4th day of April, 1838, with a capital stock of $250,000, in shares of $50 each. The commissioners appointed to receive subscriptions and distribute the stock, were to receive five per cent. on each share at the time of subscription. The residue might be secured on bond and mortgage on unincumbered real estate.

The complainant in order to obtain a part of the capital stock, in October, 1838, conveyed to Augustus Cruikshank, 109 lots of ground at Yorkville in this city. Isaac R. Freeman in behalf of the complainant, but in Cruikshank's name, thereupon applied to the commissioners, for stock in the company, which was then filling up, to be secured by mortgage on those lots. The commissioners awarded to him $16,000 of the capital stock, for which five per cent. was to be paid in cash, and the residue was to be secured by Cruikshank's bond and his mortgage on 73 of the Yorkville lots.

For the five per cent. Freeman gave to the commissioners his check for $800 on one of the city banks, and Cruikshank executed his bond and mortgage to the company pursuant to the arrangement with the commissioners. The bond and mortgage, as well as the check, were ante-dated to the 8th of October, 1838, that being the date of Freeman's written application for the stock. The check of Freeman was never fully paid.

On the 2d of November, 1838, the commissioners gave to Cruikshank a certificate, stating that they had received his bond and mortgage before mentioned and the check of Freeman, which check when paid, and the title to the property, approved by the company's counsel, would entitle C., or his order, to $16,000 of stock in the company, as soon as they were competent by law to issue the same. The capital stock of the company was filled up, the title of Cruikshank was approved, and on the 16th of November, 1838, 320 shares of the capital stock, amounting to $16,000, were placed in the name of Cruikshank, in the books of the company, and to his credit on the stock ledger.

Cruikshank re-conveyed the lands to the complainant on the . . 31st day of October, 1838, and about the time the stock was

placed to his credit, executed a power of attorney to J. H. Cunningham to sell and transfer the stock in blank, which power was delivered to the complainant. It was known to the commissioners, or some of them, that Freeman was acting for Cruikshank, but it did not appear that they or the company's officers knew that the complainant had any interest in the matter until the summer of 1839. On the 31st of March, 1839, Freeman in order to remedy a deficiency in the number of lots mortgaged, procured from Cruikshank a power by which 27 shares of the stock were transferred on the books of the company to J. B. Nones, in trust for the company.

It appeared that previous to January, 1839, creditors bills were filed against Freeman, in which injunctions were obtained, restraining the Triton Insurance Company from issuing to him the stock in question. On the 2d of January, 1839, the complainant applied to the court of chancery, by petition in those suits, to modify the injunctions so far as to permit the company to issue to him scrip for the stock, and to allow it to be transferred. J. B. Nones, the vice-president of the company, made an affidavit setting forth the facts in regard to the application, for the stock, the security therefor, and its being placed to Cruikshank's credit. This affidavit was used by the complainant on his motion, but his name did not appear in the affidavit, nor was it shown that he procured it from Nones, or that Nones knew the purpose for which it was to be used.

The motion of the complainant was denied, in March, 1839, on the ground that it was unnecessary, as the injunctions restrained the company as to Freeman only, and not as to Cruikshank or the complainant; and that it did not operate at all against the two latter, who were not parties to the suit.

In July, 1839, the company was fully apprised of the complainant's interest in the stock, and were required to deliver to him scrip for the shares of stock, or to suffer it to be transferred on their books. They were also notified that the stock would not be accepted unless it was transferred by the ensuing Thursday. They declined to transfer it or to deliver the scrip, because of the creditors suits against Freeman, in which they were made defendants, and were enjoined as before stated.

On the 6th of December, 1839, Cruikshank, as the owner of the stock, gave a proxy to Mr. Patterson, to vote on it at the election of directors of the company, then about to take place; and he made and annexed thereto an affidavit of his ownership, such as is required by the statutes relative to monied corporations.

The company persisting in their refusal to transfer the stock, Cruikshank on the 12th of June, 1840, made a written request to them to deliver up his bond and mortgage to the complainant.

This not being complied with, the bill in this cause was filed on the 13th of June, 1840. The complainant insisted that the transaction in taking the check and the bond and mortgage for the stock apportioned, was contrary to law, and void. He alleged that the company was nearly or quite insolvent; and prayed that the bond and mortgage of Cruikshank might be delivered up to the complainant and cancelled.

The Triton Insurance Company having proceeded to close their affairs, Mr. Woodhull was appointed the Receiver. The cause was continued against him, and it was brought to a hearing on the pleadings and proofs.

*J. N. Platt*, for the complainant.

*J. Anthon*, for the defendant.

THE ASSISTANT VICE-CHANCELLOR.—The complainant insists that the consideration for the bond and mortgage has wholly failed, by reason of the perverseness of the company in refusing to transfer the shares of stock; and that the scrip for the same was unwarrantably and unjustly withheld from him.

The bill states that by the arrangement between Cruikshank and the commissioners, he was to give his bond and mortgage to the company; and the commissioners agreed to issue to him therefor $16,000 of the capital stock; and that thereupon he executed the bond and mortgage in question.

The proof is somewhat variant from the charge in the bill, in reference to the $800, paid by Freeman's check, and also as to the number of lots agreed to be mortgaged. But assuming the allegation to have been proved, it appears that the commis-

sioners, or the officers of the company, as soon as the title was examined, did place the $16,000 of stock in the name of Cruikshank on the books of the company. The stock was thus *issued* to him as fully and effectually as the commissioners could issue it, or direct it to be done. The making of the certificate that Cruikshank held the stock, or what is called giving out *scrip* for it, was certainly not within the scope of their duty or their authority. Whether any of the original stockholders received any further or better evidence of their title to the stock of the company, than was contained in the stock ledger, I do not learn from the testimony. The act incorporating the company has no provision on the subject of the evidence of the right to shares, or on that of transferring them. The Revised Statutes, in the enactments relative to corporations, require monied corporations to keep a book for the registry of transfers of shares of its stock, but they contain no allusion to scrip or certificates. They also empower all corporations to make by-laws for the transfer of their stock. It does not appear that this company made any by-laws on that subject. Thus, I cannot find in the charter, in the general law, or in the contract of the parties, any requirement or provision for the issuing of scrip or certificates declaring the complainant's or Cruikshank's ownership of the shares in question. (See farther on the subject of the scrip for shares, and transfer on the stock register of a corporation, *The Commercial Bank of Buffalo* v. *Kortright,* 22 Wend. 348.)

In the *Chester Glass Company* v. *Dewey,* (16 Mass. R. 94,) one of the objections to the recovery was that the defendant could not be a member of the company without a certificate of his share ; it having been provided by the general act on the subject, that certificates of the shares should issue to the stockholders. But the court held that the issuing of the certificates was not essential to the existence of the corporation, and that the corporation might be compelled by a Court of Chancery to give certificates.

The stock in question, for a time at least, appears to have been under the control of Cruikshank, as the absolute owner. He transferred a part of it by his attorney, thereby recognizing

and asserting a title to the stock and afterwards more emphatically asserted a perfect title, by executing a proxy to Mr. Patterson, authorizing him to vote upon the stock in his behalf, at the election of directors of the company. This transaction is not explained.

The evidence in the case is conclusive to my mind that the complainant, through Cruikshank acting for him, received from the company in the stock placed in the name of Cruikshank on their books, the stipulated consideration for his bond and mortgage, as stated in the bill. Cruikshank thereby became a stockholder of the company, owning absolutely 320 shares of their stock; and entitled to all the rights and privileges of a stockholder.

The contract between Cruikshank and the company, upon which the bond and mortgage were given, was thus executed and at an end.

The subsequent conduct of the company in refusing to permit the transfer of the stock and to issue scrip for it, is relied upon as authorizing the complainant to rescind the contract and to have the bond and mortgage given up and cancelled. It is needless to inquire whether the officers of the company were warranted in their refusal; for it cannot affect my conclusion. I think that the subsequent conduct of the corporation and its officers, does not authorize this court to open and rescind a contract which has been fully executed by the parties.

I cannot infer from Nones' affidavit in connection with the complainant's motion to the court in January, 1839, that any of the officers of the company then knew of the interest of the latter in the stock; and the proof does not establish such knowledge prior to July, 1839.

If the company's refusal to permit a transfer were as injurious to the complainant as he alleges, the law provides for him a prompt and adequate remedy by an action on the case; *In re Shipley* v. *The Mechanics' Bank*, (10 Johns. 484;) or an action of assumpsit against the corporation; *Commercial Bank of Buffalo* v. *Kortright, before cited*, (22 Wend. 348.)

But this court has no jurisdiction of the subject; nor can it

indirectly acquire jurisdiction, by going back and overturning the executed agreement, which preceded the injuries complained of.

It appears that the check given by Freeman on subscribing, was not paid on presentment, nor ever fully paid. A part of it was satisfied by the company's crediting thereon a dividend on the stock standing in the name of Cruikshank. It is now contended by the complainant, that the acceptance of the check instead of cash, by the commissioners, was illegal, and the whole transaction was therefore void.

Section eight of the charter, provides that two dollars and fifty cents on each share subscribed shall be paid to the commissioners at the time of subscription. The check was given for that amount, on the 320 shares subscribed by Freeman. It was received as cash. The $800 was paid to the commissioners in the same manner that the great mass of debts is paid in this city, by a check on a bank. It does not appear that the commissioners had any knowledge or suspicion that the check was not good, or that it would not be paid in due course. They received it at their own risk. It seems that the corporation took it from them as equivalent to cash, and it is not proved but that the commissioners and the officers of the corporation believed it to be equivalent.

The company went into operation under its charter. The amount of the check being covered by Cruikshank's mortgage, there was no violation of the eleventh section of the charter, which requires the whole capital to be paid in, or secured to be paid, before the corporation commenced business.

The case of *Crocker* v. *Crane*, (21 Wend. 211,) was relied upon to establish that the whole transaction was void. In that case, the commissioners appointed to distribute the capital stock of a railroad company, were prohibited from receiving subscriptions unless two dollars on each share subscribed should be paid at the time of subscription. When the books were opened, they received uncurrent money for awhile, and then received checks for the amounts payable on subscription. They required the checks to be *indorsed*, thus manifesting that they

were not drawn against funds already deposited in bank, and were not intended to be paid on presentment. The judge who delivered the opinion of the court, said he could not doubt upon the evidence, but that the whole was an evasion of the act of incorporation, and he expressed a strong opinion that the check was void, as contrary to the policy of the statute; and as a consequence, it would follow in that case that the contemplated corporation did not come into existence.

In this case, it does not appear that a check was taken from any other subscriber for stock. And the judge says, in *Crocker* v. *Crane*, that the receiving an occasional check by the commissioners, might have been a fair substitute.

Besides, whatever may have been the rights of the state to resume the corporate franchises on this ground, or the rights of other persons interested in the company, certainly Cruikshank himself has no cause to complain. His agent, Freeman, offered the check as a payment, and as equivalent to specie. The commissioners accepted it as such, and awarded the stock to him; and the company, on going into operation, placed the stock in the name and to the credit of the principal, on their books. He cannot now be permitted to deny that the check was a payment, within the terms of the act of incorporation.

The complainant stands in the place of Cruikshank, and has no other or greater rights.

The bill cannot be sustained on the evidence, and it must be dismissed with costs. The dismissal will be without prejudice to the complainant's remedy at law, or against the receiver, for the refusal of the company to permit a transfer of the stock, or to issue the customary certificate therefor.