Thurman, J.
This is a bill originally filed by Conant, Ellis & Co., to which Joshua Baldwin and Sarah Green, administratrix of Jacob Green, were subsequently added as parties complainant. The object of the bill, so far as Conant, Ellis & Co. are concerned, is to subject certain assets to the payment of a judgment recovered by’them against the defendant, Beed, while the relief sought by Baldwin and Green is a decree for the transfer to them of sixty shares of the capital stock of the Seneca County Bank, which they claim as assignees of Beed, and upon which the bank asserts a lien for the amount of Seed’s indebtedness to it. The bill is not filed under the statute controlling assignments made to prefer creditors, nor do the complainants now seek the same property. Conant, Ellis & Co. seem to have abandoned all claim to the bank stock; and, on the other hand, Baldwin and Green ask nothing in regard to the assets pursued by Conant, Ellis & Co.
As to the claim of Baldwin & Green, the facts, so far as it is necessary to state them in the view, we take of the case, are as follows i
*258 The defendant, Reed, being the owner of sixty shares of the capital stock of the Seneca Bank, on which sixty per cent., amounting to $3,600, had been paid by his written assignment of January 15, 1848, transferred the same to said Jacob Green and Joshua Baldwin, as collateral security for the payment of a note of $5,000, made by him, and them as his sureties to the Franklin Branch of the State Bank. The object of the assignment was to indemnify Green & Baldwin against loss ; and at the time of delivering it, Reed also delivered to them his certificate of stock. It is not pretended that the Seneca Bank had any notice of this *assignment until August 4, 1848. On that day, as Reed testifies, he informed the defendant Arnold, the cashier of the bank, that he had made the assignment; and he further swears that, with Arnold’s consent, he then transferred the stock to Baldwin & Green, on the transfer book of the bank. At the time of this transaction, Reed was a director of the bank, and largely indebted to it. The circumstances of the transfer are thus stated by him:
“ Sylvanus Arnold, cashier of the bank, stated to me that, in order to make up his report as cashier, it was necessary that some one or more of the directors or stockholders who were indebted to the bank should transfer their stock, in order that he might so state the liabilities of the directors and stockholders, that their liabilities should come within that section of the law requiring that they should not be liable as principals or indorsers to a certain, extent; and, in order to enable him to make up his report agreeably to law, he requested me to transfer my stock in a confidential manner. I then stated to him that I had then pledged and transferred my certificate of stock to Joshua Baldwin and Jacob Green, who had become liable for me as indorsers on a note previously discounted at the Franklin Branch Bank at Columbus, in the sum of |>5,000; that I would transfer the stock to these parties in accordance with an arrangement previously made with them, and declined transferring it to him, or any other person. This transfer was accepted by said Arnold, cashier of said bank. The said Arnold then produced the transfer-book, and the stock was transferred to these parties, he fully consenting to the assignment, and the transfer was made in the transfer-book and was left in the said bank.”
On cross-examination, the witness swears : “ Mr. Arnold requested me, as before stated, in order that he might be able to make up his report, to transfer the said stock to him; that it should be a confi *259 dential matter; that he would cut it out of the transfer-book. This suggestion I positively declined, and then stated the facts heretofore set forth of the transfer having been previously made to Green and Baldwin. I did not ^request him to place the same .among his private papers—this was a question coming directly from himself, when he made the suggestion of a transfer to himself— there was no understanding that any other disposition should be made of this transfer certificate, other than the transfer itself set forth.”
Tomb and Arnold, the president and cashier of the bank, have answered; and, by agreement, their answer is to be taken as the answer of the bank also. They deny that they, or the bank, had ■any notice of the assignment to Baldwin & Green before November 17, 1848. They also deny that said transfer of August 4 was ever consented to by the directors of the bank or a majoxfity of them, and assert it was not known to any of the directors, except Eeed who made it, until November 17,1848. They aver that it was a pretended tx-ansfer, made under the following circumstances : “ On the 15th of July, 1848, respondent Arnold had been chosen cashier of said bank, and had not become familiarly or fully acquainted with his duties as such cashier, nor of the true nature or extent of the liabilities of the directors thereof to said bank, either as the principal debtors or securities for others, or othex'wise; and being required by law to make report to the auditor of state early in August, 1848, and being anxious to obtain payment on notes and bills due to said bank, and especially those due from directors and stockholders, for the purpose of making as favorable a report as the facts would authorize, he called on said Eeed, who was then a director of said bank and lax’gely indebted thereto, and requested and urged him, said Eeed, to make payment of the whole or a part of his said liability; to which respondent Eeed replied to the re-' spondent Arnold, that he was about to make arrangements to pay all his debts, and particularly those due said bank, and agreed that if he failed to make such payments by the time said Arnold would be required to make out said report, that he, the said Eeed, in such event, would assign his stock in said bank to the said Arnold, to enable him to make such report, and that he, *said Arnold, should l'eassign the same upon receiving payment of the debts of said Eeed to said bank. That this arrangement was made prior to August, 1848, and shox’tly after the respondent Axmold assumed the duties *260 of cashier. That afterwards, on the 4th of August, 1848, the said. Reed having failed to make payment as aforesaid, for the pui’pose of enabling respondent Arnold, as such cashier, to make the report aforesaid, attempted to assign said sixty shares of stock to said Green & Baldwin, instead of making the same to said Arnold for-the use and benefit of said bank. That said Reed represented said Groen & Baldwin as his personal and confidential friends ; that he did not wish it to be made known to any one that such transfer had been made, and that he would shortly arrange his matters with said bank in a satisfactory manner. That, at the urgent request of said Reed, respondent Arnold, as such cashier, and not then being a director of said bank, consented thereto, and such pretended assignment was made on a blank taken from the transfer book of said bank, by filling up such blank; which blank, so filled up, at the instance and urgent and repeated request of said Reed, was, after being taken from such transfer book, placed by respondent Arnold among his own private papers in his pocket to be held by him, the. said respondent Arnold, in trust for said bank until the indebtedness of said Reed thereto should be paid; which payment said Reed then assured said Arnold should be made in a very short time. Respondent Arnold denies that such pretended transfer was for the benefit of said Green & Baldwin, but for the benefit of said bank as aforesaid.”
The answer further states that, on August 7,1848, the date of the report to the auditor of state, “ the liability of stockholders and directors in said bank thereto, including the liability of said Reed in the premises, was $17,593.55, when by law said liability might have been $18,000. But as said Reed had so pretended or attempted to assign his stock as last aforesaid, respondent Arnold did not include his liability as among the liabilities of stockholders to said bank.”
*These statements in the answer are substantially repeated in the deposition of Arnold, who was called as a witness by the complainants.
It further appears that Reed’s indebtedness aforesaid was carried into judgments on August 26, 1848, which judgments were, on August 31, 1848, fully paid and satisfied out of the proceeds of the discount by the bank, on that day, of three acceptances of Carrington & Pardee, of New York, which Reed then held and indorsed to the bank, and a note for $2,000, then made by Reed and others to *261 the bank; which acceptances and note Reed procured to be so dis counted. It is expressly averred, in the answer of the bank, that the judgments wore so paid, and that, by order of the bank, a return of satisfaction was made on the executions that had been issued thereon. It also appears by Reed’s testimony that he failed to discharge said note to the Franklin Bank, and that Baldwin & Green were under the necessity of paying $3,600 thereof, being the same amount that had been paid on the bank stock aforesaid; under which circumstances, the stock has been considered and treated by him and them as belonging to them, and he makes no claim thereto, and swears that he has no interest therein.
Upon this state of facts, the first question that arises is, Was the transfer of August 4, 1848, to Baldwin & Green, valid? We have no difficulty upon this point.
The 46th section of the Banking Law (43 Ohio L. 43) enacts that “ The capital stock of each banking company shall be divided into shares of one hundred dollars each, and shall be assignable on the books of the company, in such manner as its by-laws shall prescribe ; but no shareholder shall have power to sell or transfer any shares, held in his own right, so long as ho should be liable, either as principal debtor, surety, or otherwise, to the company, for any debt which shall have become due, and remains unpaid; nor in such case shall such shareholder bo entitled to receive any dividend, interest, or profit on such shares, so long as such liabilities shall continue; but all such dividends, interests, or '^profits, shall bo retained by the company, and applied to the discharge of such liabilities; and no stock shall be transferred, without the consent of a majority of the directors, while the holder thereof is indebted to the company.”
These provisions are designed to protect the bank by giving it a lien on the shares of its stockholder for the amount of his indebtedness to it, which he shall not be allowed to defeat by a transfer of his stock, without the consent of a majority of the directors, nor even with their consent, if his debt is overdue and unpaid. True, it is provided, by the 47th section of the act, that “No banking ■company shall take, as security, for any loan or discount, a lien upon any part of its capital stock; but the same security, both in kind and amount, shall be required of shareholders,” etc. But this is entirely consistent with what we have said. The intent of the act is to give the bank a double security where a stockholder is the *262 debtor: first, the same security that persons not stockholders are required to give: secondly, a lien upon his stock. These are wise provisions, tending to protect the bank and the public against the consequences of improvident or dishonest loans to irresponsible stockholders. It is judicious and right to require more security of a shareholder than of another person ; and giving a lien on his stock is only carrying out the principle that obtains in ordinary partnerships, that the interest of the partner is what remains after deducting his debts to the firm.
As the bank, then, on August 4,1848, held a lien on Reed’s stock, for his indebtedness, he could not defeat that lien by a transfer, without the consent of a majority of the directors, if the debt had not matured; nor with their consent, if it was overdue.
It is contended for the complainants, that such consent should be presumed from the facts that are in proof; but we do not think the-testimony warrants it. This, however, is not material; for it appears by Reed’s deposition that part of his indebtedness was then overdue and unpaid; so that ho had no power, on August 4, 1848, even with the directors’ *assent, to transfer his stock We are-therefore clear that the legal title to the stock did not pass to Bald.win & Green by the attempted transfer on that day.
The next question is, Did Baldwin & Green take any interest in the stock by the assignment of January 15th? On the part of the bank it is argued that no interest, legal or equitable, can be conveyed except by a transfer made on the books of the bank pursuant to the statute. For the complainants, it is contended that, though such a transfer is necessary to pass a legal title, an equitable title-may be otherwise transferred.
We are of opinion that the position of complainants is sustained by both reason and authority. The object of the statute, as we have already said, is to protect the bank by giving it a lien on the stock, or, rather, this is the main purpose; for there are other useful ends attained by requiring transfers to be made on its books. It preserves them in a durable and convenient form, and enables the bank and purchasers to know, with certainty, who are the legal holders of its stock, and who, prima facie, are entitled to its dividends.
But it never was intended that, while, in respect to all other property, the legal title may be in one person, and the equitable title in another, as to bank stock, both legal and equitable title must be vested in the same individual. This anomaly would be the neces *263 sary result, were we to adopt the reasoning of the counsel for the bank. But such a position is contradicted by a multitude of cases-that might be put, and by the bank charter itself, which, in the very section under consideration, recognizes the right of one person to hold stock in trust for another, by the provision that “ no shareholder, shall have power to sell or transfer any shares, held in his-own right, so long,” etc. Again, suppose a devise of stock; does-the devisee take no interest until the stock is transferred to him on the books of the bank by the executor? Is any such transfer necessary? Does the stock go to the executor at all? Is not the devisee the owner of it, and has he not a right, upon probate of the will and surrender of the *testator’s certificate, to demand and have a new certificate issued to himself, provided the testator's-estate is not indebted to the bank ?
Or, take a case of intestacy. Has the administrator no right to' the stock of the deceased until it is regularly transferred to him on the transfer book? Or, has an assignee under the insolvent laws-no interest in such stock before it is so transferred to him ? Or,, can no lien be acquired upon it by a creditor’s bill ?
Other illustrations might be given, but these are quite sufficient to show that an assignment on the books of the bank is not the only mode by which an interest in stock may pass. Possibly it is the only mode of transfer by which the lien of the bank can be extinguished. But, subject to that lien, the stock may be otherwise transferred; and though the legal title may not pass, an equitable title will. And the bank is bound to respect such equitable title from the time it receives notice of its existence. These views are fully sustained by the authorities. See Bank of Utica v. Smalley, 2 Cow. 777; Gilbert v. Man. Iron Co., 11 Wend. 628; U. States v. Cutts, 1 Sumn. 139; Com. Bank of Buffalo v. Kortwright, 22 Wend. 362; Quiner v. The Marblehead Ins. Co., 10 Mass. 476; Sergeant v. Franklin Ins. Co., 8 Pick. 90; Union Bank of Georgetown v. Laird, 2 Wheat. 390, and Black et al. v. Zacharie & Co., 3 How. 483.
The next inquiry is, When did the bank receive notice of the assignment of January 15 to Green & Baldwin ?
Eeed swears that he informed the cashier, Arnold, of it on August 4, 1848. Arnold swears that he did not, and that the bank had no notice of it until in November following. Here then we have witness against witness, and we must determine, by the circumstances and reasonable probabilities of the case, whose statement is connect. *264 The complainants disclaim any intention to question Arnold’s character for truth, as he was called by them to testify; but this does no.t relieve us from the necessity of deciding, as well as we are *able, which of the witnesses is in error; nor does the law require of us so impossible a thing as that we should put implicit confidence in witnesses whose own statements place them in, to say the least of it, a very suspicious attitude. Eeed says that the attempted transfer on the books of the bank, on August 4, was a bona fide attempt on his part to fully execute his agreement with Baldwin & Green. Arnold flatly denies this, and says it was a mere “pretended assignment,” to enable him, Arnold, as cashier, to make the report required by law.
Now, let us see what was this report, thus required:
The 59th section of the banking law enacts that “ on each dividend.day the cashier shall make and verify by his oath a full, clear, and accurate statement of the condition of the company as it shall bo on that day, after declaring the dividend ; and similar statements shall also be made on the first Monday of February and August in each year.” It then declares what particulars the statement .shall contain, among which are the following: “The total amount of the liabilities to the company, by the directors thereof, collectively, specifying the gross amount of such liabilities as principal debtors, and the gross amount as indorsers or sureties.”
“ The total amount of the liabilities to the company, of the stockholders thereof collectively, specifying the gross amount of such liabilities as principal debtors, and the gross amount as indorsers or sureties; which statement shall be forthwith transmitted to the auditor of state.”
The reason of these provisions is found in the fact that the charter restrains the directors and stockholders from becoming liable beyond a certain amount. Now, if the transfer of August 4 was a mere sham, it left Eeed just where ho was before making it, namely, a stockholder and director largely indebted to the bank. His indebtedness ought, therefore, to have been included in the report; yet, Arnold admits that it was not so included. Indeed, take Arnold’s own statement-, and it shows that he sought from Eeed a pretended transfer to himself, to enable him to leave out Eeed’s indebtedness. In view of these facts, charity herself can go no further than *to admit the excuse given by him in his answer, when he says that he was not “ fully acquainted with his duties as *265 •such cashier.” A better acquaintance with his duties would have taught him that it was no part of them to get pretended transfers to enable him to make reports, under oath, seemingly true but actually false.
Nor does Eeed place himself in an attitude entirely above suspicion. True, he denies that he made any pretended transfer or .•attempted to make one ; but, on the other hand, he admits that the •president of the bank had stated to him “ that it would be necessary for some of the stockholders to transfer their stock, in order that a report might be made,” and that “ it was understood, and was a matter of conversation among the directors generally, that some •stock must be transferred in order that he (the cashier) could make a report; yet it does not appear that the witness’ sensibilities were •at all shocked by such a proposition. It is not a pleasant thing to •find the determination of important rights dependent upon a discovery of the truth, from testimony so uncertain and conflicting; and we are fully aware that the most we can do is to ascertain whether the evidence preponderates upon one side or the other. We think, after the most careful investigation and reflection, that'the weight ■of testimony is on the side of the complainants. The reasons given by Arnold, why the attempted transfer of the 4th of August was to Baldwin & Green, are not as satisfactory as those stated by Eeed ; and it is more charitable, to say the least of it, to suppose that Arnold, when he reported under oath to the auditor, believed that Eeed had effectually conveyed his stock, than to impute to him the crime involved in a willful making of a false report.
Upon this branch of the case, then, we are of opinion : 1. That the assignment of January 15, 1848, to Baldwin & Green, is good in equity. 2. That notice of it was given to the bank on August •4, 1848—notice to the cashier being, in our opinion, notice to the bank. 3. That the present indebtedness of Eeed to the bank ac■crued after the receipt of said ^notice. 4. That Baldwin & Green made the payments aforesaid to the Franklin Bank.
It follows that the complainants, Baldwin & Green, are entitled to a decree for a transfer of said stock to them, and also for the dividends that have accrued thereon since August 4, 1848.
We are next to consider the claim of Conant, Ellis & Go. The assets which they seek to subject to the payment of their judgment are certain lands, or their proceeds, which were conveyed by the •defendant Eeed to Abel Eawson, in trust for the benefit of the de *266 fendant Hitchcock, and subsequently, pursuant to an agreement made between Eeed, Hitchcock and the bank, conveyed by Eawson to the defendants, Tomb and Arnold, to satisfy, as they (T. &. A.)allege, two of Carrington & Pardee’s acceptances which Eeed had' procured to be discounted by the bank as before stated; the remaining acceptance having been paid by the acceptors. The bank, took the land at $6000, and paid for the same by cancelling and-delivering up said two acceptances, amounting, with interest, etc.,, to over $4000, and paying to Hitchcock the residue. Subsequently Tomb and Arnold, holding the legal title and acting for the bank, sold the lands for less than $6000, receiving part of the consideration in hand, and notes for the residue; which proceeds, or the-lands themselves, Oonant, Ellis & Co. pray may be subjected to the-payment of their claim. They place their right to this relief on. the ground that Eeed’s indebtedness to the bank was incurred in, violation of its charter, whence they argue that the bank’s claims upon him were void, and it can not have the benefit of any trust created for their payment, or retain any money or property paid in absolute discharge of them. The provision in the charter to which we are referred is in these words: “ The stockholders, collectively, of any independent banking company, shall, at no time, be liable to such company, either as principal debtors or sureties, or both, to an amount greater than three-fifths of the amount of capital stock actually paid in, and remaining undiminished by losses *or otherwise; nor shall the directors be so liable, except to-such amount, and in such manner as shall be prescribed by the by-laws of such company, adopted by its stockholders to regulate their liabilities.”
It is admitted that no such by-laws were adopted by the stockholders of the Seneca Bank until 1850. The indebtedness to pay which said lands were conveyed to Tomb and Arnold was incurred, by Eeed, August 31,1848, when, as complainants allege, and the bank admits, he was a director. There is some uncertainty, however, whether he was a director at that time. He had assigned his stock to Baldwin & Green, as before stated; and the charter provides that “ each director shall own, in his own name and right, at least one per centum of the capital stock of the company.” Besides this, he swears that he never acted as director after August 4th.
But let it be assumed that he was a director, we are by no means-prepared to say that his indebtedness to the bank was a nullity. ¥c are admonished by counsel, that, unless we so hold, the provision» *267 in the charter is a dead letter, and the consequences may be disastrous ; but we can not admit the soundness of either of these propositions. Indeed, it would be easy to show that much more fatal consequences would result from the construction contended for by the complainants, and that it would place both stockholders and the public at the mercy of dishonest directors. And so far is the provision upon either construction from being a nullity, that its willful violation is possibly a sufficient cause for a forfeiture of the charter, and renders each director who knowingly participates in or assents to, the same individually liable for all damages which the company, its shareholders, or any other persons, body politic or corporate, shall have sustained in consequence of such violation. 43 Ohio L. 50, sec. 66. Now it would be rather an odd construction to hold that the loan to the director gives no right of action, when not only he, but also the directors who made the loan in wilful violation of the charter, are made responsible by the 66th section, *above cited. Again, as between a bank and its directors, the latter are but agents; and what court has ever permitted an agent to set up his own misconduct toward his principal to defeat the latter’s right of recovery against him ? And in what better position is a mere creditor of the agent who has sustained no loss by the misconduct in question ?
But it is unnecessary for us to decide whether the debt was a nullity; for let it be granted that the bank could have sustained no action for the recovery of the money loaned, or upon the securities taken, what equity does that confer upon the complainants ? The bank parted with its money to Beed, and he repaid the bank in land. That the land was conveyed and accepted in absolute payment, there can be no doubt. So the defendants, Tomb and Arnold, swear in their answer, and the testimony supports them. The acceptances indorsed by Beed were canceled and given up, and the bank, pursuant to its agreement, paid to Hitchcock the remainder of the consideration of the conveyance. Where is the wrong in this? Was it immoral, illegal, or against public policy for Beed to repay money he had actually received from the bank ? Were the complainants injured by the loans the bank had made to him, and had they a right to say he should not make payment? How is it where usury laws prevail ? A usurious debt can not be recovered. It is declared by the statute to be void; but has it ever been held that a creditor at large of the borrower can recover the *268 money paid in. discharge of it ? It is contended, however, that the complainants are not creditors at large; that they have filed a creditor’s bill, and therefore have a right to prevent the bank from receiving payment out of the proceeds of the lands; and we are referred to a dictum in Green v. Morse, 4 Barb. 343, to the effect that a creditor who had proceeded to judgment and execution against the assignor, and thus seized the assigned property, or filed a creditor’s bill against the assignor and assignees to set aside the assignment as fraudulent against bona fide creditors, for the reason that it provided for the payment of usurious and void debts, would not *be estopped from assailing the provisions of the assignment made in favor of debts affected with usury, as a creditor coming in under the assignment clearly is.
It is not necessary for us to gainsay this doctrine. A usurious borrower is not estopped to set up the usury by way of defense, and every one in privity of blood or estate with him may make the same defense, though a mere stranger or creditor at large can not. And it may be that a creditor who has seized projDerty in execution, or filed a creditor’s bill to reach it, is in such privity of estate that he may go into chancery to set aside an assignment of it in trust to pay a usurious debt. But even in that case it might be a serious question whether the usurious lender would not be entitled to receive the sum actually loaned, upon the principle that he who goes into equity must do equity. If the borrower himself seeks relief in equity against a usurious contract, it is well settled that it will be afforded only upon condition that he pay what in good conscience he ought to pay; and it will perhaps be difficult to see why a creditor of the borrower should stand in a better position in this respect 'than the borrower himself.
But here it is not necessary to estop the complainants to allege the illegality of Reed’s debt. The debt was not immoral, and it has been paid. True, the lands were not conveyed directly to the bank. The conveyance was made to the president and cashier; but it was none the less a payment. It was not a conveyance upon trusts to sell the property, and out of the proceeds pay the debts; but the debt was paid by the conveyance itself. The evidences of indebtedness were canceled and given up, and the bank, in lieu thereof, became in equity the owner of the lands. When this took place, the complainants were creditors at large. They had neither seized the property in execution nor filed their bill. *269 They do not, therefore, come within the dictum above cited from Green v. Morse. On the contrary, it is expressly laid down in that case as clearly settled law, that money or property paid in discharge of a usurious debt *can not be recovered back by the debtor; and it is plainly deducible, from what was said and decided by the court, that no such recovery can be had by a creditor of the usurious debtor, unless such creditor had acquired a lien upon the money or property before the payment. And so we understand the law to be.
We have carefully examined the cases cited by complainants’ counsel; but they do not, in our opinion, contravene the views we have here expressed. It follows that Conant, Ellis & Co. are not entitled to the relief they seek, and the bill, so far as they are concerned, must be dismissed.
As the complainants say that they ask no decree against the defendants, Hitchcock and Pennington, I have not thought it necessary to refer to them particularly.

Decree accordingly.