## THE NEW YORK AND NEW HAVEN RAIL ROAD COMPANY *vs.* ROBERT SCHUYLER and others.

A corporation is liable for the acts of its transfer agents in issuing false certificates, and allowing false transfers, and for negligence on the part of the corporation, and its officers, in permitting transfers of spurious stock to be made on the books of the company, to persons desirous of becoming stockholders therein.

Permitting its books to be used for the purpose of committing frauds on others who are desirous of purchasing stock; issuing to such persons certificates of stock; and informing buyers who apply for information in regard to stock, before they pay for it, that stock has been transferred on the books,

New York and New Haven Rail Road Co. *v.* Schuyler.

when it has not, are also acts for which a corporation should be held responsible.

So a corporation is liable to respond in damages for any loss sustained either by the *fraud* or the *negligence* of its officers or agents in discharging the particular duty assigned them; as where a company is bound to keep transfer books for the purpose of transferring stock, and on being applied to by persons about to purchase stock in the company, to know whether shares have been transferred to them, the officers and clerks give the information that shares have been transferred, and also give the certificate thereof; on which statements money is paid; when in fact no money has been paid, and the party making the transfer had no stock to his credit, to dispose of.

A plaintiff is never required to do equity in order to obtain equitable relief, in any other matter than that in which he seeks to obtain it; and then he is to do equity by restoring to the party whatsoever he may have received from him in the transaction sought to be set aside. The rule requiring a party seeking equity, to do equity, does not apply to a case where damages may be recovered for the injury.

Where the capital stock of a corporation is limited by its charter, to a certain number of shares, it is not in the power of the board of directors, by any resolution or act of such board, to increase the number of shares beyond that amount.

Neither can they delegate to their agent, either directly or indirectly, authority to make such increase. Nor will any act of negligence or misconduct, on the part of such agent, effect, by any liability for such acts, what the corporation could not do directly.

Consequently, the doctrine of *estoppel* cannot be applied to give validity to what would be an illegal act, or to prevent the company from setting up, in an answer to a claim to such stock, that the same is void, as being issued in excess of the capital.

No one can be estopped from refusing to do an illegal act; but an estoppel can only operate in favor of a party injured, where there is no provision of law forbidding the party against whom the estoppel is to operate from doing the act which is sought to be carried out through its operation.

The doctrine of estoppel is only available to the party for whom it was designed, and does not operate in favor of a stranger to whom the representation was not made.

No legal title passes to any one who receives from the owner a certificate of shares of stock, issued by a corporation, with a transfer indorsed thereon, and a power of attorney to transfer the same, even though the person to whom such stock was delivered advanced money on the receipt thereof. But the party receiving the same only acquires an equitable title, valid against the party named in the certificate, to compel a transfer of such shares on the books of the company, while the same remains in his name thereon.

New York and New Haven Rail Road Co. *v.* Schuyler.

By the law and by the statute of Connecticut, passed in 1849, such an assign-ment is not valid against any but those making it and their representatives; and such law operates upon all transfers of the stock of the company, whether made in Connecticut or New York.

A transfer on the books of the company, for value, to a *bona fide* holder, will pass to him the shares so transferred, although at the time the transferror had a certificate in his name outstanding for the same, which he did not surrender at the time of the transfer.

The fact that the owner has pledged the certificate to a third party, as security for money borrowed, without notice to the company thereof, will not affect such transfer, or the title of the transferree, to the stock so transferred.

A transfer by a person who, at the time, holds no shares on the books of the company, passes no title to any shares of stock in the company.

Such a transfer conveys no title to stock subsequently acquired, and cannot be made good by a transfer to the person making the same, of subsequently acquired stock.

Stock received and transferred on the same day should, in equity, be consid-ered as received before it was transferred, although the numbers of the transfer may be such as to make the transfer by the transferror appear earlier than the transfer to him; unless it is proven that such transfer was made prior to the one by which the stock was assigned to the transferror.

The by-laws of a corporation, requiring a surrender of the certificate before making a transfer, are not binding on third persons, so as to affect their rights, or deprive them of their property.

Where stock is transferred under a power of attorney attached to a certificate, which power also contains an assignment of the shares, and authority to transfer such shares, the power will not authorize the transfer of any share acquired after the date of the power.

Such transfer can only operate to transfer stock held by the person named in the certificate and power, at the date of the power ; and if such stock was previously transferred by him, no title will pass, under the transfer of the attorney, to any stock subsequently acquired by such person.

In the case of a certificate and power of attorney held by the party to whom it has been pledged, without making a transfer on the books of the com-pany, the same rule should be applied. Such certificate and power will give to the holder an equitable title to any valid stock held by the person named therein, at the date of the power, if he continues to hold such stock ; but if all the stock held by the party at the date thereof has been sold by him, then the certificate has ceased to be of any value, and should be canceled.

Where a corporation has permitted its agents to sell stock covered by certifi-cates when there was stock standing to its credit sufficient to cover such certificates, it is bound to make good such certificates to the extent of any shares owned by the corporation, within the capital stock of the company ;

and the shares of stock unsold should be applied to the satisfaction of the oldest outstanding certificate of that character.

Persons who have received transfers of spurious stock in a corporation by the acts of its transfer agent, or certificates of spurious stock from such transfer agent, without knowledge or ground of suspicion of fraud or irregularity, and have advanced money thereon, are entitled to recover damages against the company, in a proper action.

Parties who have been misled by the acts or negligence of the officers of a corporation, and have advanced money in consequence thereof, are entitled to recover damages against the corporation, in a proper action.

And persons holding certificates of stock, valid when they were issued, accompanied by an assignment and power, on which they have advanced money, may recover damages against the corporation when such certificates have been rendered of no value by the allowance of transfers on the books of the company, without requiring the surrender of the certificates.

In such an action it is not necessary that all the persons holding spurious shares of stock should be made defendants.

Rules for the separation of the stock, in such an action.

THIS action was brought by the plaintiff for the purpose of ascertaining whether the stock held by the defendants in the New York and New Haven Rail Road Company was spurious, either in whole or in part, and if so, to have the same declared void, and ordered to be canceled; and to enjoin the defendants from prosecuting any actions then pending against the company, or bringing actions to enforce any claims founded upon such stock. Such of the defendants as answered denied that their stock was spurious, and set up various grounds on which they claimed their stock to be valid, and in many instances set up counter-claims for damages against the company.

The action was tried at a special term, before the court, without a jury. The material facts are set forth in the following opinion; particularly in the findings of fact therein.

*Wm. Curtis Noyes, Wm. Tracy* and *Charles Tracy,* for the plaintiff.

*D. Lord, F. B. Cutting, W. M. Evarts, John E. Burrill, Wm. Bliss, J. Larocque,* —— *Rutherford* and others, for the defendants.

INGRAHAM, J.  In disposing of this case, the main ques-tion arises as to the proper rules to be adopted in order to ascertain which stock is valid, and which is spurious.  On the part of the plaintiffs, it is claimed that no transfers are to be recognized but such as are entered on the books of the company; that the issue of a certificate of stock, or an assignment thereof, did not vest in any person other than the holder on the books of the company, any title to such stock, until the same was transferred on the books of the company; that all transfers made in excess of stock owned by the trans-ferror, and all certificates for shares not held by the party named, were void; that the outstanding certificates did not prevent the transfer of the stock represented by it, and that the holder, without notice to the company, obtained no rights against the company, until such notice was given; that the company might waive the requirement of the by-law calling for the surrender of the certificate before transfer; and that the company are in no respect liable for the acts of Schuyler or his representatives, when done or made in transactions not authorized by the company.  On the part of the defendants, the grounds of defense vary according to the particular inter-ests of the several defendants, which it is unnecessary here to recapitulate.

The first inquiry is as to the effect of the over issue by the Schuylers in their transfers prior to October, 1853.  It must be remembered that there was no over issue of capital stock at any time prior to that date, so far as related to the whole amount of stock outstanding on the books of the company. The excess was in the account of the Schuylers alone.  If there had been such an over issue at that time, beyond the capital of the company, and that had not been remedied by calling in and cancelling sufficient stock to reduce the amount down to the actual capital, such false stock remaining on the books would undoubtedly affect the title of all persons to whom such shares should subsequently be transferred; but if the whole capital of the company was not at that time

exceeded by such over issues, there would be nothing to prevent the company from receiving from the Schuylers payment for such over issued shares, or a satisfaction therefor, either by a re-transfer from them to the company, or in some other manner, by which the company could recognize such shares as valid, and treat the holders thereof as stockholders of the company. This appears to have been done in part, by a transfer of valid stock to R. & G. L. Schuyler from the company, of five hundred shares, on the 25th day of January, 1849, and of one hundred shares from R. Schuyler to R. & G. L. Schuyler, (which on the 25th day of January were transferred by the company to Robert Schuyler,) and by the purchase from Drew, Robinson & Co. and others, of seven hundred and forty-eight shares, on the 31st day of January, 1849. By these purchases the account was balanced, and no further excess of transfer took place prior to the time when the distribution and issue of the five thousand additional shares took place in August, 1851. The company at that time recognized all the stock outstanding, as legally issued, and as valid stock, and in whatever way such excess was remedied, whether by payment, by the purchase of other shares, and agreement with the company, or by some other arrangement, the acts of the company in recognizing such stock as entitled to a dividend and a share of the new stock to be distributed, and the acts of the company subsequently, down to October 18, 1853, in continually allowing transfers on the books, of this stock, are sufficient to warrant the presumption that by some arrangement between Schuyler and the company that over issue had been satisfied, the company had adopted the stock as good, and had recognized the holders as valid stockholders of the company. From this period in January, 1851, until October, 1853, no other over issue took place, and the stock ledger at all times balanced, and I am of the opinion that such over issued stock of 1853 is to be deemed good stock, made so by the assent of the company and by arrangement with Schuyler, and that the subsequent

over issues of 1853, and 1854, cannot be aided or made good by any attempt to affect the previous transfers in consequence of over issues in 1848.

The next question is, what title, if any, passes to the holder of a certificate for good stock, who advances money upon it, having a power of attorney to transfer, but not making the actual transfer on the books of the company. It must be conceded that the certificate is nothing but evidence of title in the person named therein. It is not the thing claimed; it is not the stock nor the representative of stock. The delivery of the certificate to another would convey no title. The transfer of the certificate would amount to nothing, so far as the shares on the books of the company were to be affected, and as between the holders and a third person who had purchased the stock by transfer from the person to whom the certificate was issued. I can see no ground on which the court can hold that the holder of the certificate has any right which can overthrow the legal title to the shares obtained by transfer on the books. In the *Mechanics' Bank case* (4 *Duer*, 525,) Justice Slosson says: "The title to the stock, as between the seller and the buyer, is not affected by these provisions, (the rules as to transfer,) and the purchaser has a right to assume that the certificates represent actual stock, and that the company, whose business it is, has done its duty in seeing that the old certificate has been duly surrendered before the issuing of the new." The rules adopted by the company, as to the mode of making transfers, requiring a surrender of the certificate, although they may be insisted on by the company, yet are not sufficient to affect the rights or interests of third persons, who are ignorant of their provisions. (*Mechanics' Bank* v. *Smith*, 19 *John*. 115.) In the *Bank of Utica* v. *Smalley*, (2 *Cowen*, 770,) and *Gilbert* v. *Manchester Iron Co.*, (11 *Wend.* 627,) it was held. that a transfer by a stockholder of his stock passes his interest, although not made in conformity to the by-laws of the company. And in *Bargate* v. *Shortridge*, (31 *Eng.*

New York and New Haven Rail Road Co. *v.* Schuyler.

*Law and Eq.* 58,) it is said by Lord St. Leonards, in deciding that case, "I laid it down, after a great deal of consideration, that a company could be bound if they neglected to perform ceremonies, which they ought to perform, to the damage of other parties. In that case, transfers were held to be good, although the forms required were not complied with."

The pledge of the certificate, with the power attached, as security for money, would be similar to a mortgage on land without notice to a purchaser, and the grantee would take the title free from the mortgage lien. It is to give such notice that the registry act has substituted a recording for actual notice. Without that act, the mortgagee would not be protected except by actual notice. So in this case, the pledgee can claim no right to protection against a *bona fide* purchaser, without notice to him or to the company, to prevent such transfer, although he may hold an assignment, valid as between him and the pledgor, and which he might have enforced at any time while the pledgor held the stock on the books of the company. That the holder of the certificate and assignment with the power, takes an equitable title to have the stock transferred to him on the books of the company, is conceded, but this I consider to be all the title which he acquires. Until he exercises this right, he has no legal title to the stock. He can neither claim a right to vote, nor a right to dividends. He can exercise no power of transfer, except as attorney for the party executing the power; and if he neglects to give the company notice of his claims, or to have the stock transferred to himself, he has no right afterwards to avail himself of such neglect to deprive a third person of the stock, who has purchased it in the ordinary course of business, and to whom it has been transferred by the holder on the books of the company, even, although at the time of the transfer, the company may have waived the surrender of the certificate. The purchaser has no means of knowing whether such surrender has been made. He has a right to presume the company have discharged their duty.

He is guilty of no fault or negligence, while the holder of
the certificate is justly chargeable with the consequences of
his own neglect in holding the certificate and power without
either transfer to himself or notice to the company.   And if,
under such circumstances, a transfer is made to a *bona fide*
purchaser without notice, such purchaser cannot be deprived
of the stock so purchased, by any equitable title which the
holder of the certificate may have against the former owner,
or against the company, to compel a transfer.

These principles were referred to in the Mechanics' Bank
case in 3 Kernan, although it may be said that as the cer-
tificates represented spurious stock, they were not absolutely
necessary to the decision of that case.   In *Ex parte Willcocks*,
(7 *Cowen*, 411,) the court says, in regard to hypothecated
stock: "We do not hesitate to say, that in a clear case of
hypothecation, the pledgor may vote.   The possession may
well continue with him, consistently with the nature of the
contract, and the stock remain in his name.   Till enforced,
and the title made absolute in the pledgee, and the name
changed on the books, he should be received to vote.   It is a
question between him and the pledgee, with which the corpo-
ration have nothing to do."   In the *Union Bank* v. *Laird*,
(2 *Wheat*. 390,) it was held, that no person could acquire a
legal title to shares, except under a regular transfer accord-
ing to the rules of the bank, and that if any person took an
equitable assignment, it must be subject to the rights of the
bank.   So it has been repeatedly held in Connecticut, that
a sale or pledge of stock, with a power of attorney to trans-
fer, is of no avail until the transfer is made on the books of
the company. (2 *Conn. Rep.* 579.   3 *id.* 546.   6 *id.* 552.
5 *id.* 246.)   In *Wilson* v. *Little*, (2 *Comst.* 447,) Ruggles,
J. says: "The case does not show what the by-laws of the
company were.   It may be that nothing short of the trans-
fer of the title on the books of the company would have been
sufficient to give the defendants the absolute possession of
the stock and to secure them against a transfer to some other

person." Even admitting that both parties have an equal equitable title, the transferree on the books has, in addition, the legal title, and in such cases the rule that the legal title and equal equity shall prevail over the equity, would prefer such party to whom such transfer had been made in the books. I am, therefore, of the opinion that the transfer of stock upon the books of the company to a *bona fide* holder for value, carries the title to the stock, although the certificate previously issued was not surrendered at the time of the transfer.

Another question which arises in this case is, whether a transfer of stock made by a party who, at the time, had no stock in his name on the books of the company, can be made good by subsequently acquired stock. That such a transfer may be so made good by a person who has made transfers beyond the amount held by him, by an agreement with the company that other stock shall be so applied to his credit, I think cannot be doubted. If such over issue has taken place, there is no equity in refusing to the party making it the right to make it good. This may be by the party who has done the wrong, paying for the stock and making it valid, if the company had any shares undisposed of, or by placing an equal number of shares to his credit, and agreeing to such an application, and in this way the wrong would be remedied, and the party injured, as well as the company, be protected from loss. It was suggested that in such a case the party receiving the transfer was not a party to the agreement, and therefore it would not be binding on him, so as to deprive him of a claim for damages, but he would, in such a case, sustain no damage. He could, in no instance, recover beyond the value of the stock. But, beyond this, I know of no rule by which subsequently acquired stock can be made available to make good previous transfers, which, at the time they were made, conveyed title to no stock whatever. The party making it, transferred nothing, for he owned nothing. The party receiving the transfer, acquired no title to stock, because the transferror had nothing to transfer, and therefore could give title to no

stock. The warranty of title, which is implied in the sale of personal property, would not draw after it the subsequently acquired property, as it does in real estate, because, in such a case, the transferror is not the party who suffers alone, but the company also, and because the subsequently acquired stock would not be the same stock which the vendor previously agreed to sell. That rule, in regard to real estate only, applies to the specific piece of property sold with a warranty of title. But after acquired stock can, in no case, be identified as the same stock transferred by the previous transfer, and the rule, as to real estate, could not be made to apply to the case of stock of an incorporated company. There is, therefore, no rule or principle by which after acquired stock can be applied to making good a previous transfer, unless it is done by a special agreement that such application shall be made, or by payment therefor, if the company has surplus stock to be so applied.

There are some instances of such transfers, apparently, where the evidence would not allow the application of the rule—not because it is not applicable, but because the evidence will not warrant the conclusion that the transferror had received the stock. I refer to those cases in which, if the numbers of the transfer are relied on exclusively, the transfer is made at an earlier number than that in which the transferror received the stock. Where both papers bear the same date, we can presume that they were made as they ought to have been, instead of presuming that any fraud was actually committed; and, in such cases, it is very easy to suppose the transfers were filled up, and left to be executed at the same time, although the numbers of the transfers make them appear to be misplaced. Without special proof that such transfers were made before the stock was received by the transferror, the evidence is not sufficient to warrant the presumption that the transfer was improperly made. As no such evidence has been furnished in regard to any transfers so executed, the stock must be presumed to have been received before the

transfer was executed, although of a number prior to that by which the transferror obtained the same, whenever both transfers bear the same date.

Another question arises as to what passes under a certificate and power of attorney, where the transfer on the books is not made until long after the date of the power. By the power of attorney annexed to the certificate, the party executing first assigns a specified number of shares of stock, and then authorizes the attorney to transfer the said shares. The date of the power, and not the time of making the transfer, must decide what stock is transferred. The power of attorney authorizes the transfer of the said stock, viz. the stock previously transferred therein, and it cannot, in any way, be made applicable to stock acquired after its date and execution. If the transferror had stock in his name at the time of the execution of the power, and stock still continues in his name until the transfer is made on the books of the company, the stock would pass under the transfer. But if the transferror, subsequent to the execution of the power, had disposed of all the stock standing in his name, the attorney could transfer no subsequently acquired stock, and such transfer would, therefore, be a nullity.

The same rule must be applied to outstanding certificates with powers, which have not been transferred. If any such are held by any of the defendants, and the party giving the power had stock standing to his credit on the books of the company, at the date of the power, the person holding the certificate and power should be allowed to change his equitable title to a legal one by transfer; but if no such stock remains in the party giving the certificate of the date of the power, then there is no stock to meet such certificate and power, and the same should be declared void.

Having thus disposed of the case on the part of the plaintiffs, it becomes necessary to decide as to the claims set up by the defendants for damages, either by way of counterclaim, or upon the ground that the plaintiffs, before they can

call upon the court for equitable relief, must do equity. Neither claim can be sustained, unless it is established that the plaintiffs are liable to the defendants in some form for damages on account of the issue of spurious stock; for allowing transfers on their books of such stock, and giving certificates therefor, when no such stock existed; or for allowing valid stock to be transferred without requiring a surrender of the certificates previously issued therefor. It becomes, therefore, necessary to inquire what liability, if any, can be enforced against the company. This question, to some extent, has been discussed by the learned justices of the court of appeals, in the cases referring to this company.

In the case of the *Mechanics' Bank* v. *The New York and New Haven Rail Road Company*, (3 *Kernan*, 599,) Mr. Justice Comstock, in delivering the opinion of the court, held " the certificates to be utterly void, not only on the ground of no equity on the part of the plaintiffs, which could be enforced against the defendants, but also upon the ground that they were issued by Schuyler without authority, and beyond the powers vested in him by the company, and that such certificates were void under all possible circumstances, so that no person, in whatever situation, could claim under them the rights of stockholders, or damages on the ground of a refusal to admit them to such rights." The same views were repeated by him in a dissenting opinion in the *Farmers and Mechanics' Bank of Kent* v. *The Butchers and Drovers' Bank*, (16 *N. Y. Rep.* 142.) And in this case, when before the court of appeals, in 17 *id.* 592, it is also said, that " it is impossible to say that any one of them is a valid representative of stock, or claim of any kind against the corporation." If these questions had been necessarily involved in the cases referred to, the opinions there delivered would be conclusive upon this court, and it would be unnecessary to make any further examination in regard thereto. But as these questions were not necessarily involved in either case, it cannot be considered that the opinions, on those points, were necessarily

the decisions of the judges of the court of appeals, but only the views as entertained by the learned judges who delivered those opinions.

To a certain extent, the case of the *Mechanics' Bank* v. *New York and New Haven Rail Road Company*, in 3 *Kernan*, is a decision of the claims of some of the defendants here. I understand the court in that case as holding that a person dealing with the fraudulent agent, who has knowledge of the fraud, or who received the certificate of stock without paying any value therefor, could acquire no rights against the company, and that persons taking such certificate from him received the same, subject to all the equities that existed between the assignor and the company. There is no case in which stock was thus obtained, except those in which Kyle received the certificates, and passed them to others; and that decision can hardly be said to control the claims of any other defendants than those who dealt with Kyle. The other expressions used in the opinions in those cases can only be regarded as the separate views of the learned justices by whom they were delivered, entitled here to the highest consideration. It must be remembered, however, that in those cases the facts upon which the defendants' claims are based, were not in evidence, and could not have been then considered by the learned judges in forming their decisions.

From the evidence now before me, these claims arise in the following cases :

*First.* For the fraudulent act of Schuyler in issuing certificates of stock, as held by R. & G. L. Schuyler, for which there was no stock to their credit, and which was not based on any transfer of stock to them, and obtaining from the holder an advance of money thereon.

*Second.* For allowing transfers of stock on the books, by persons having no stock to their credit at the time of transfer.

*Third.* For giving certificates of stock to the credit of persons to whom such transfers were made, when in fact no stock had passed by such transfers.

*Fourth.* For allowing the holders of good stock to transfer the same, without requiring a surrender of the certificate previously issued, on which the claimant has made advances.

Many of the persons holding claims for the spurious stock, or on account of it, have not set up any counter-claims in their answers; and in such cases it is only material to decide on the right to present such claims, as it might limit the extent of relief to be given to the plaintiffs in the final judgment in this case. The principal grounds upon which it appears to me such claims may be sustained, are for the acts of the transfer agent in issuing false certificates, and allowing false transfers, and for negligence on the part of the company, and its officers, in permitting transfers of spurious stock to be made on the books of the company, to persons desirous of becoming stockholders therein. The charter requires such books to be kept, and designates the purposes for which they are to be used. Permitting them to be used for the purpose of committing frauds on others who were desirous of purchasing stock; issuing to such persons certificates of stock, and informing buyers who applied for information in regard to stock, before they paid for it, that stock had been transferred on the books, were, in my judgment, acts for which the company should be held responsible. (*See Bank of Ireland* v. *Evans's trustees*, 32 *Eng. L. and Eq. Rep.* 32.) They retained from public examination the books of the company; no other means could have been adopted than those that were used, to ascertain what stock had been transferred, and whether their money could be paid in safety, while attending to such transfers, and giving certificates of stock was a matter which was specially confided to the charge of the transfer agent and his clerks. In the case in the court of appeals, before referred to, the want of authority on the part of the agent to issue certificates for spurious stock, is the reason given for not enforcing any liability. In the Mechanics' Bank *v.* The Company, it was conceded by the learned justice, that if Schuyler had been the agent of the company to sell stock and issue certificates

therefor, a sale and certificate by him would have been valid against his principals, although he applied the proceeds to his own use; and, he adds, " Such were not the relations between Schuyler and the corporation, nor was he held out to the world as standing in such relations. He had no power to sell stock at all, and none to issue certificates, except as incidental to a sale between existing stockholders; and then it depended on the condition precedent of a transfer on the books," &c. The evidence on the present trial shows the reverse of these propositions. All the stock, with the exception of about one thousand shares, was, from the organization of the company, disposed of by the transfer agent, as the officer of the company, by transfer, either to the new subscribers, obtained on the second subscription, or to other persons to whom it was sold and transferred by him; and, down to a very late period of his agency, such transfers are found on the books. How far these facts might have altered the conclusions arrived at in that case, it is not for me to say.

There are some counter-claims set up by the defendants in this action, which would not warrant a recovery in any action. In this class the averment is, that the defendants purchased the stock, (now found to be spurious,) or, by certificate, became entitled to it, and applied to the officers of the company to be allowed to transfer such stock on the books of the company, and were refused. I am at a loss to see how this can be a cause of damage against the company. If the stock was spurious, the plaintiffs were bound, in discharge of their duty, to refuse such application. The transfer of spurious stock on the books of the company would afford the claimant no better security, and could result in nothing to his advantage, excepting in exposing the company to a claim for damages, in permitting such a transfer upon the books. In such cases, the holder of the certificate or stock can claim nothing for the refusing to allow a transfer of spurious stock on the books of the company. If they can recover at all, it must be upon the rights as they existed at

the time of receiving the certificate or transfer, and for other causes than the mere refusal of the company to permit a transfer of spurious stock upon their books. The claimant could sustain no legal damage because the company would not allow a transfer of spurious shares on their books, or would not give the certificate for spurious shares, even after such a transfer had been made. I can see no ground on which such a claim can be allowed.

A second ground of counter-claim is for the fraud of Schuyler in issuing false certificates, and making false transfers on the books of the company to the defendants, while he held no stock to meet such transfers and certificates. In the opinion of Mr. Justice Comstock, in the Mechanics' Bank case, 3 Kernan, he says : "It must be conceded, as a further result, (if the certificate is void,) that the certificate is void under all possible circumstances, so that no person, in whatever situation, can claim under it the rights of a stockholder, or damages, on the ground of a refusal to admit him to such rights." And again he says : "I do not see how certificates of stock, which they themselves had no authority to issue, void in their origin, and, under all conceivable circumstances, can be made the basis of a liability ruinous to the genuine stockholders, by turning the spurious instruments into a promise or undertaking that the stock in fact existed." I suppose both in the case above cited and in the present case, in 16 N. Y. Rep., the opinion is fully expressed, that for such fraud of the agent the company is not liable.

. The case of *Hubbersty et al.* v. *Ward* (18 *L. and E. Rep.* 351) is relied on, which holds that a captain, after signing bills of lading for goods received on board of his vessel, has exhausted his authority, and that he has no power, by signing other bills of lading for goods not on board, to charge his owner. So also *Grant* v. *Norway*, (2 *Eng. Rep.* 337.) The like ruling in *Coleman* v. *Riches*, (59 *L. and E.* 323,) holds that where an agent, whose duty it was to receive goods, and give receipts therefor, fraudulently gave a receipt for goods

which had not been received, the principal was held not to be responsible, because it was not within the scope of the agent's authority, in the course of his employment, to give such receipt. Although these, and other authorities cited, would seem to deny the liability of the principal for the fraudulent act of the agent, when in doing such act he exceeded the authority conferred upon him, I should not be inclined to hold them conclusive upon this question. In the case last cited, Williams, J. says : "If it had appeared that by the course of business the defendant was bound, for the benefit of the plaintiff, to furnish the plaintiff with a receipt, I should have had a difficulty in saying that the defendant was not liable." These cases, however, in regard to bills of lading, differ from the present one in the fact that, in all these cases, the party to whom the bill of lading was issued in the first instance must necessarily have been a party to the fraud of the captain, and stood in the same relation to him that Kyle did to Schuyler, in the case in 3 Kernan. In all other cases of dealings with Schuyler, there is no evidence of such knowledge on the part of those who dealt with him.

In the *Bank of the United States* v. *Davis*, (2 *Hill*, 451,) Ch. J. Nelson says : "It is no answer to say that a director of a bank is not to be regarded as acting in the capacity of a director in behalf of the bank, but for himself, while engaged in perpetrating the fraud. Nor is there any thing novel or singular in the idea that an agent may be guilty of fraud and deception in transacting the business of his principal, or in the law that holds the latter responsible for the consequences to third persons." In that case it was held, that the act of a director in getting paper discounted, and using the funds for himself, while he knew that the paper belonged to another, was a fraud upon such party, and that the bank was liable for such fraudulent act, upon the ground that the director knew of the fraud and knowledge in the director, was notice to the bank of such intended fraud. Ch. J. Nelson says : " The plaintiffs appointed the director, and held him out to

their customers and the public as entitled to confidence. They placed him in a position where he has been enabled to commit this fraud." And in the late case of *The Farm. and Mech. Bank of Kent* v. *The Butchers and Drovers' Bank,* (16 *N. Y. Rep.* 125,) the rule as to the liability of the principal for the act of the agent is qualified, so as that, while the agent must be acting in the business of the bank and within the scope of his employment, *so far as that can be known or seen by the party dealing with him, the bank would be responsible.* The reasoning of Mr. Justice Selden in that case, upon this point of the liability of the principal, appears to be fully applicable here. He says, "the bank selects its teller (transfer agent) and places him in a position of great responsibility. The trust and confidence thus reposed in him by the bank leads others to confide in his integrity. Persons having no voice in his selection are obliged to deal with the bank through him. If, therefore, while acting in the business of the bank and within the scope of his employment, *so far as is known or can be seen by the party dealing with him,* he is guilty of misrepresentation, ought not the bank to be responsible? The fact misrepresented is not only one within the knowledge of the agent, but one with which he is made acquainted by means of the position in which he is placed—which it is his special province and duty to know, and which would scarcely be ascertained, except by application to him." It seems to me that under no form of words could a more forcible argument be adduced to show the liability of the company for the acts of Schuyler while professing to act as transfer agent in a matter apparently within the scope of his authority, and when the fact misrepresented was peculiarly within his own knowledge.

There is also another class of cases in which a counter-claim is set up, and in which there are probably stronger grounds for recovery. I refer to that class in which the negligence of the officers or clerks of the company is charged upon them as the cause of loss and damage. The claim rests

upon the duty imposed by law upon the company to keep transfer books for the purpose of transferring stock in the company, and upon the fact that when applied to by persons about to purchase stock in the company, to know whether shares had been transferred to them, the officers and clerks of the company gave the information that shares had been transferred, and also gave the certificate thereof; on which statements money was paid, when, in fact, no shares had been transferred, and the party making such transfer had none to his credit to dispose of. For this negligence of the officers and clerks of the company in discharging the particular duty assigned them, I see no reason why the principal should not be held responsible. They were directed to keep these books by law; they refused to purchasers of stock the privilege of examining for themselves such books, and when the purchasers resorted to the only means of protection which remained, viz. by inquiring of the clerks whether the stock had been transferred, they were misled, through the willfulness or negligence of the officers of the company, and sustained loss thereby. It seems to me so contrary to every principle of justice and honesty to say that for such acts, either of fraud or negligence, the company should not be responsible, that I cannot assent to that proposition in regard to either of those conclusions, but, on the contrary, I am of the opinion that, under these circumstances, the company is liable to respond in damages for any loss sustained thereby, either for the fraud or the negligence of its officers or agents. In the present case, however, I am of the opinion that counter-claims cannot be allowed. The action is not brought upon any contract. It is an equitable action, to have what is deemed an injury to the owner of the property invested in the stock of the company, removed. In such an action there cannot be a counter-claim, except such claim as arises out of the transaction set forth in the complaint as the foundation of the plaintiffs' action. The claims of the defendants do not arise out of that transaction, but are subsequent to it. They

are properly the subject of a distinct action. The other case in which a counter-claim is allowed by the code, is where the action is founded upon a contract, and the defendant has a claim upon contract, he may set off one against the other. As neither this action nor the counter-claim in this case rests upon contract, that clause does not apply to this case. (*Burns* v. *Nevins*, 27 *Barb.* 493.) Although I am of the opinion that most of the claims of the defendants might be sustained in actions against the company, I am forced to the conclusion that, in this case, such counter-claims cannot be allowed, because they are not warranted by the code of procedure.

It was urged in behalf of some of the defendants, who have not set up a counter-claim in their answers, that they could obtain relief upon the principle that, before the court grants to the plaintiffs the equitable relief to which they may be entitled, they should be required to do equity. That rule, however, is not one which can be applied to these cases. A plaintiff is never required to do equity in order to obtain equitable relief in any other matter than that in which he seeks to obtain it, and then he is to do equity by restoring to the party whatsoever he may have received from him in the transaction sought to be set aside. It does not apply to a case where for the injury damages may be recovered, and it would be almost impossible as to most of the defendants in this case to ascertain, from the evidence furnished, what damages they are entitled to, if damages were awarded. I do not intend to say that the court might not retain the cause, and order the damages to be assessed by a referee or a jury. (5 *John. Ch.* 194.) The latter would probably be the better course, and then each assessment would be equivalent to a trial. I can see no benefit to be derived by the defendants from such a course. On the contrary, by leaving the defendants to their separate actions for damages, a speedy opportunity is allowed to have the question of liability, as decided in this case, to be reviewed in the court above, and

New York and New Haven Rail Road Co. *v.* Schuyler.

the right to such damages will thus be settled without the great delay that will necessarily take place if such assessment was made at the present time. I, therefore, deem it unnecessary to discuss further than I have done, the particular cases under which these damages are claimed. It is sufficient for the purposes of this action to say, that these claims are not of that class which have been passed upon by the court of appeals, that they may be presented by the parties in such a manner as to entitle the defendants to recover against the company; and that, on that account, no injunction should be awarded restraining the defentants from bringing such actions, if so advised. There are also cases in which certificates, good at the time they were issued, have been rendered invalid and worthless by the negligence of the company or their agents in permitting a transfer to be made in violation of the transfer regulations. Without any further discussion of those claims, I shall content myself with saying that no injunction restraining actions for damages by such parties should be granted, and that in such cases a good cause of action might exist against the company for which damages may be recovered. (*Pollock* v. *National Bank,* 3 *Seld.* 274. *Commercial Bank* v. *Kortright,* 22 *Wend.* 348.)

My conclusions on this branch of the case are, that no claim for damages can be recovered by the defendants against the plaintiffs in this action. And secondly, that no injunction should be granted restraining any of the defendants from bringing or prosecuting such actions, if so advised.

A motion was made when the plaintiffs rested, and was renewed at the close of the case, to dismiss the complaint, because it appeared that some persons who had spurious shares were not made defendants. That it would have been desirable to have all the persons who had spurious shares united in one action, so long as such an action could be in any event maintained, is not to be denied. But there is no absolute necessity for such a result. So far as there are defendants holding spurious stock, the decision as to them will be bind-

ing.   If afterwards other parties are found holding spurious shares, their rights can be ascertained in another action, without in any way interfering with the determination as to the present defendants.   The action might have been maintained as to one defendant, or as to more than one, and as between the plaintiffs and the present defendants, their rights can all be determined in this action.   In the case of William Dennistoun, it was urged on behalf of his counsel, that as the transfer to him was the first transfer of Schuyler, by which an over issue was made, the company should be required to apply the seventy-eight shares held by them undisposed of, to make good the shares in that transfer which are otherwise spurious.   I suppose it is conceded by all the cases, that if the company had shares undisposed of, with which they could make good the over issues, they would be compelled to do so, and would be estopped from denying the validity of such transfers.   The doctrine of estoppel, I have heretofore said, does not apply to make good an act forbidden by statute, but that rule would not apply to the seventy-eight shares undisposed of.   The defendant Dennistoun is not, however, entitled to those shares.   The persons holding certificates issued prior thereto with power of attorney and transfer, having an equitable title to any stock which could be applied to such a purpose, would have a prior equity to that of Dennistoun.   Such stock should be properly applied to the oldest certificates.   And where there are some originally valid, and which have been made void by transfer, I think the company should apply those shares to satisfy such certificates.   As the parties holding the oldest certificates are not parties to this action, no judgment can be made therein to direct such application.   I refer to it here in answer to the claim made to such shares on behalf of the defendant Dennistoun.

Most of the facts on which the plaintiffs have based their action are not disputed by the defendants, and so far as there has been evidence furnished on the trial, that evidence has not contradicted any of the material facts proven on the part

of the plaintiffs, so as to raise any doubt as to the facts of this case. The decision of this case rests mainly on the legal questions which have been submitted by the respective counsel. I consider the following facts as established:

1. That the company was duly incorporated by the legislature of Connecticut, in 1844. That in 1846, the legislature of New York authorized the company to extend their road to and unite with the Harlem Rail Road Company at Williamsbridge, and such act was assented to by the legislature of Connecticut the same year.

2. That in pursuance of the charter the board of directors attempted to obtain subscriptions for the capital stock of the company, which attempt failed.

3. That afterward, about October, 1846, a formal subscription was made by certain persons to the capital stock of the company, amounting to 24,400 shares, exclusive of the subsequent increase, on which a payment of one dollar per share was made. That a board of directors was elected on the 19th of May, 1846, and the company was then duly organized. That on the same day the directors organized their body by electing Robert Schuyler president. That on the 10th of November, 1846, the board resolved to make up the capital stock to 25,000 shares, and passed a resolution providing for a further subscription and distribution thereof, together with 9680 shares placed by the former subscribers with the president of the company for distribution, and directing the same to be offered for sale and distribution on terms prescribed by them in the resolution.

4. That various subscriptions were afterwards obtained, by which the whole of such stock was subscribed for.

5. That such subscriptions were recognized by the company, although not obtained in the mode specified in the act of incorporation, by the resolutions passed December 31, 1846.

6. That subsquently, in August, 1851, the board of directors agreed to increase the capital stock to 30,000 shares, and directed the same to be apportioned among the then ex-

isting stockholders, as standing on the stock ledger for the dividend payable on the 15th of August, 1851.

7. That on the 15th August, 1851, a dividend was declared and paid to the stockholders on the books of the company, according to the stock ledger, which comprised all the stockholders then owning stock on the books of the company, as per Exhibit No. 29, at which time R. & G. L. Schuyler were recognized as holders of 854 shares.

8. That such distribution was accordingly made, and the 5000 shares were so distributed and taken by such stockholders, except 68 shares, which were fractions of shares, not taken by those who were entitled thereto, and which remained undisposed of.

9. That Robert Schuyler was appointed transfer agent at New York, J. G. Sheffield at New Haven, and J. E. Thayer & Brothers at Boston, by resolutions of the board of directors on 3d February, 1847.

10. That the stock so subscribed for and distributed, appears to have been, in most, if not all cases, transferred by one of the transfer agents, on behalf the company, to the subscribers.

11. That there were, at all times, transfers made to the transfer agents on the books of the company, for the account of the company, and the stock so transferred was afterwards disposed of by such agents.

12. That ten shares of stock taken by George Peck were declared forfeited on 4th May, 1853, and a resolution then passed, authorizing the president to sell the same, and also the 68 shares of the stock not taken in fractional shares, by the subscribers, so as to make the whole capital stock 30,000 shares.

13. That George W. Whistler was appointed vice president on 10th August, 1853, and resigned 31st May, 1854.

14. That William E. Worthen was appointed vice president on 14th June, 1854.

15. That on the 5th July, 1854, the transfer books of the company were closed.

16. That Robert Schuyler, the president, was a member of the firm of R. & G. L. Schuyler.

17. That said firm held large amounts in the stock of the company.

18. That prior to the distribution of the 5000 shares in August, 1851, the firm of R. & G. L. Schuyler, by transfer, had caused an over issue of stock in their stock account, to a large amount, and exceeding 1000 shares above the number of shares that had been transferred to them previous to such over issue.

19. That it does not appear in what manner such over issues were remedied, but that on the 17th of October, 1853, Schuylers' stock account balanced with four shares to their credit.

20. That at all times previous thereto, the stock ledger account always balanced with the stock issued by the company, so that at no time previous thereto was there an issue by the company or its agent of more stock in the aggregate than 30,000 shares.

21. That at that date R. & G. L. Schuyler had outstanding certificates signed by R. Schuyler, transfer agent, for 7042 spurious shares of stock for which no transfer had been made to them on the books of the company.

22. That in October, 1853, R. & G. L. Schuyler commenced an over issue of shares by transfer, and that between that time and the 4th of July, 1854, there were transfers of spurious shares made by them up to that date on the transfer books of the company amounting to 17,497 shares, and certificates also outstanding in their name for shares for which no transfers existed on the books, to 1648 shares, making the whole amount of over issued stock by transfer and by certificate 19,145 shares.

23. That these shares and certificates are claimed by the

defendants in part, and by others, as will appear by a statement hereto annexed.

24. That the over issue of stock was originally made in some cases by transfers, when there was no stock standing to the credit of the Schuylers, and in other cases by the issue of certificates for stock, when no such stock was owned by them, accompanied with an assignment and power of attorney, authorizing a transfer, and then in most cases such stock was subsequently transferred on the books of the company by the attorney, excepting in the cases of 1648 shares pledged by the parties to whom the certificates were issued as security and not transferred on the books of the company.

25. That in some cases the certificate when issued was a certificate for valid stock held by R. & G. L. Schuyler at the date of its issue; and after the same was issued, that R. & G. L. Schuyler transferred on the books of the company such shares without surrendering the certificates.

26. That the transfers were all made in books kept by the company, which were regularly numbered prior to the book being used for the purpose of transferring, and in some cases transfers were made by the Schuylers, as well as by others, of shares which were transferred to them either on the same or a subsequent day—such transfers in some cases being for the same number of shares, and in others for amounts of different quantities, and the transfers made by them were sometimes numbered of a later number than that by which they received the stock.

27. That the company provided rules for transferring stock, as set out in the complaint, by which rules it was provided that all transfers should be made in the books of the company, and that all certificates of stock, which should have been issued, must be surrendered prior to a transfer of such stock being allowed on the books of the company. These rules also provided for transfers by attorney under a power of attorney under seal.

28. That the company adopted a form of certificate and

power of attorney. That in the power of attorney so adopted and used, there was a clause of transfer and assignment by the person in whose name the stock purported to be standing when the certificate was issued.

29. That in many cases the company, or their agent, permitted transfers of stock to be made in the books to persons other than those to whom such certificate and power with an assignment had been pledged as security, and that such transfers had been made in violation of the by-laws adopted by the company as to transfers.

30. That the persons holding such certificates did not give notice to the company of their claim to a lien upon such stock, until after such stock had been transferred on the books of the company.

31. That such persons have sustained damage thereby.

32. That in most of the cases in which the defendants have appeared and answered, proof has been furnished to show that such defendants, on receiving the transfers and certificates, either paid value for the stock if purchased, or made loans thereon, in good faith, and without knowledge of the frauds or over issues of Schuyler, and without any grounds sufficient to cause suspicion thereof.

33. That in the case of Kyle, it does not appear that he paid any value to Schuyler for the stock issued to him, but it is shown that the Mechanics' Bank loaned money to Kyle upon the said certificates, and had a transfer to them of part of the stock.

34. That in many of the cases the defendants, before paying for their stock, or advancing money thereon, made or caused to be made application to the officers or clerks in the employ of the company to know if stock had been transferred to them, and were informed that such transfers had been made, and that they then paid or advanced money, relying on such information from the agents of the company.

35. That in all such cases the defendants have sustained

damage from the acts of the officers, clerks, or agents of the plaintiffs.

36. That Robert Schuyler failed on or about the 3d day of July, 1856, and then communicated to the board of directors that difficulties existed as to the stock, and referred them to the stock ledger as containing much that was wrong.

37. That, up to that time, there is no evidence of any actual knowledge by any of the directors of any fraudulent acts on the part of Schuyler, in the performance of his duties as transfer agent.

38. That such frauds were committed both as transfer agent of the company, in giving false certificates, and permitting false transfers on the books of the company, as well as a stockholder of the company as one of the firm of R. & G. L. Schuyler, in making transfers and obtaining certificates from the company for more shares than they held on the books of the company.

39. That a proper examination of the books by the directors would have enabled them to discover the frauds which were perpetrated by Schuyler, and that the board of directors were guilty of negligence in not making such examinations, and in leaving the entire charge and control of the transfer of shares, and giving certificates, with Schuyler, without making such examination.

40. In making out the statement of facts, the general finding only is stated, and, in these respects, many others may be thought necessary to be added, by the respective parties. The particulars of each case in which the defendants have answered will also be stated, for which the findings must be drawn and settled hereafter, in connection with those above stated, if the same shall be deemed necessary.

The law, as applicable to these facts, I find as follows, viz:

1. The stock of the company being limited to 30,000 shares, by the charter of the company, it was not in the power of the board of directors, by any resolution or act of such board, to increase the number of shares beyond that amount.

2. If the directors could not, by their own act, increase the number of shares beyond 30,000, they could not delegate to their agent, either directly or indirectly, authority to make such increase.

3. If neither the board, nor its agents acting under its authority, could do an act by which the capital stock could be increased, no act of negligence or misconduct on the part of such agent could effect, by any liability for such acts, what the company could not do directly.

4. Consequently, the doctrine of estoppel cannot be applied to give validity to what would be an illegal act, or to prevent the company from setting up, in answer to a claim to such stock, that the same is void, as being issued in excess of the capital.

5. By this I mean, that no one can be estopped from refusing to do an illegal act; but that an estoppel can only operate in favor of a party injured, where there is no provision of law forbidding the party against whom the estoppel is to operate, from doing the act which is sought to be carried out through its operation.

6. The doctrine of estoppel is only available to the party for whom it was designed, and does not operate, in favor of a stranger to whom the representation was not made, and is not applicable to this case excepting as hereafter stated.

7. That no legal title passed to any one who received from the owner a certificate of shares of stock, issued by the company, with a transfer indorsed thereon, and a power of attorney to transfer the same, even though the person to whom such stock was delivered advanced money on the receipt thereof, but that the party receiving the same only acquired an equitable title, valid against the party named in the certificate to compel a transfer of such shares on the books of the company, while the same remained in his name thereon.

8. By the law, and by the statute of Connecticut, passed 1849, such an assignment is not valid against any but those making it and their representatives, and such law operates

upon all transfers of the stock of the company, whether made in Connecticut or New York.

9. A transfer on the books of the company for value, to a *bona fide* holder, would pass to him the shares so transferred, although at the time the transferror had a certificate in his name outstanding for the same, which he did not surrender at the time of transfer.

10. The fact that the owner had pledged the certificate to a third party, as security for money borrowed, without notice to the company thereof, would not affect such transfer, or the title of the transferree, to the stock so transferred.

11. A transfer by a person, who at the time held no shares on the books of the company, passed no title to any shares of stock in the company.

12. Such a transfer conveys no title to stock subsequently acquired, and could not be made good by a transfer to the person making the same of subsequently acquired stock.

13. Stock received and transferred on the same day should, in equity, be considered as received before it was transferred, although the numbers of the transfer may be such as to make the transfer by the transferror appear earlier than the transfer to him; unless it was proven that such transfer was made prior to the one by which the stock was assigned to the transferror.

14. The by-laws of the company, requiring a surrender of the certificate before making a transfer, are not binding on third persons so as to affect their rights, or deprive them of their property.

15. Where stock is transferred under a power of attorney attached to a certificate, which power also contained an assignment of the shares, and authority to transfer the said shares, the power did not authorize the transfer of any shares acquired after the date of the power.

16. Such transfer could only operate to transfer stock held by the person named in the certificate and power, at the date of the power; and if such stock was previously transferred

by him, no title would pass under the transfer of the attorney to any stock subsequently acquired by such person.

17. In the case of a certificate and power of attorney, held by the party to whom it was pledged, without making a transfer on the books of the company, the same rule should be applied. Such certificate and power would entitle the holder to an equitable title to any valid stock held by the person named therein of the date of the power, if he continues to hold such stock to the present time, but if all the stock held by the party at the date thereof has been sold by him, then the certificate has ceased to be of any value, and should be canceled.

18. That the company having permitted R. & G. L. Schuyler to sell stock covered by certificates when there was stock standing to their credit sufficient to cover such certificates, is bound to make good such certificates to the extent of any shares owned by the company, within the capital stock of the company, and that the seventy-eight shares of the company unsold should be applied to the satisfaction of the oldest outstanding certificate of that character.

19. That the defendants who have received transfers of spurious stock by the acts of the transfer agent, or certificates of spurious stock from the transfer agent of the company, without knowledge or ground of suspicion of fraud or irregularity, and have advanced money thereon, are entitled to recover damages against the company, in a proper action.

20. That defendants, who have been misled by the acts or negligence of the officers of the company, and have advanced money in consequence thereof, are entitled to recover damages against the company, in a proper action.

21. That persons holding certificates of stock, valid when they were issued, accompanied by an assignment and power, on which they have advanced money, may recover damages against the company when such certificates have been rendered of no value by the allowance of transfers on the books of the company, without requiring the surrender of the certificates.

22. That such damages cannot be recovered in this action by way of counter-claim.

That the following rules must be adopted, as to the separation of the stock:

1. The certificates are to be rejected where a transfer of the stock or shares mentioned therein has been made on the books, and the certificates, with power attached, have ceased to be of value, where all the stock held by the party at the date thereof has been transferred.

2. That the transfers on the books of the company are to be held valid, even without the surrender of the certificate at the time of the transfer.

3. That transfers only convey the legal title to stock held by the party at the time of making the transfer.

4. That transfers made on the same day on which the stock is received, are valid and convey the title, although the transfer to the party is entered in the transfer book, on a transfer of a prior number than that by which he received the stock, provided the date of both transfers is the same.

5. That transfers by power of attorney can only convey stock held by the party executing the power of attorney at the time of its execution, and in the absence of any other proof, the date of the power must be taken as such time. If there is no date to the power and no proof of its execution, the date of the transfer by the attorney must govern.

6. If all the stock, held at the date of the power, has been transferred by the party giving the power, before the attorney makes the transfer, no stock would pass under such transfer, and the same is to be disregarded.

7. The same rule must be applied to outstanding certificates and powers, where no transfer has been made by the attorney, and where an equitable title exists in the holder of the same; and if all stock held by the party giving the power at the date thereof has been transferred, such power and certificate ceases to be of any value, and no stock can be transferred thereby.

In making the distribution of the stock, according to these rules, I have found it necessary to provide a different stock ledger from that furnished by any of the parties on the trial. Such a compilation will be filed with the clerk of the special term, at the time of making this decision, and is marked " Stock Ledger adopted by the court," with the title of the cause, and signed by the judge. After a reasonable time it will be delivered to the plaintiffs, to be kept by them for future reference. The cases in which this ledger differs from that produced on the trial, and designated as No. 82, will be seen on examination, as all the alterations from that exhibit are made in red ink, and can easily be distinguished. The result of this division of the stock makes the persons designated in the list herein contained, to be the holders of the spurious stock. Where a certificate has been issued, the number of the certificate is given; and, in all cases, the number of spurious shares, either in whole or in part, is stated. As to some persons named therein, as holding spurious stock, no decree can be made, because they are not parties to this action. As to others who are parties, it will be necessary for the plaintiffs, if they see fit to ask a judgment as to all the shares so held, to amend the complaint in regard to the number of spurious shares held by those parties. As to those defendants who have not appeared or answered, the plaintiffs are entitled to judgment by default; but no decree, as to the stock held by them, will be made in the cases in which their stock is found to be good.

Under these rules, the following stock, held by the defendants named, is adjudged to be spurious and void; the certificates are ordered to be canceled, and the holders thereof are to be restrained by injunction from claiming the same as valid stock, or bringing any action to enforce such claim; but such injunction is not to be considered as preventing the defendants from making any claim for damages, or bringing any action therefor, for any of the causes before stated, as furnishing grounds for recovering damages against the

company. Such judgment will apply to all the persons named in the following list, except Ezra Baldwin, William B. Cooley, Gracie & Dashwood, W. S. Holabird, R. H. King, R. L. Maitland & Co., J. W. Perrot, Edwin Sherwood, W. Tuller and H. S, Tyler, who were not made defendants, and against whom no judgment can be rendered. [Here follows a list of the names of persons claiming stock, by transfers, or otherwise, which is declared to be spurious.]

The following certificates of stock held by defendants, which were issued by R. Schuyler, transfer agent, in the name of R. & G. L. Schuyler, subsequent to October 18, 1853, and which were so issued fraudulently, there being no stock held by them at the time of giving such certificates, are declared to be void, and are ordered to be canceled, and the holders thereof are to be restrained by injunction in like manner as before directed, viz: [This list is omitted.]

And the following certificates of stock, issued prior to October 18, 1853, for stock which was then held by R. & G. L. Schuyler, and were at the time certificates of good stock, but which were afterwards rendered of no value by the transfer of the same stock on the books of the company, by R. & G. L. Schuyler, are declared to be of no value, and are ordered to be canceled, and the holders thereof are to be restrained by injunction in like manner as before directed, viz: [Also omitted.]

The following certificates represent stock that has been transferred by the holders on the books; but as no proof has been furnished to show who are the holders thereof, no judgment can be rendered in regard thereto, viz: [Also omitted.]

The following defendants, who have appeared and answered, have not been shown to be the holders of spurious stock. On the contrary, the stock held by them has been found good, according to the rules adopted by the court, and as to them judgment must be rendered in their favor, with costs: R. H. Arkenburgh, Anna Maria Clarkson, A. B. Davis, John H. Dykers, Alfred S. Fraser, Lorenzo Hull, William H. King,

John M. Knox, George M. Mead, William H. Rogers, A. D. Wyckoff, Rush Tuller, J. H. Whitson and Charles Wright.

The defendants Duncan, Sherman & Co. having disclaimed any title to the stock standing in their name, and disclosed the name of the owner, no judgment can be rendered as to them, and the complaint as against them is dismissed, with costs.

As to the costs of the other parties plaintiffs and defendants, no costs are awarded to either; but the judgment, as far as rendered in favor of the plaintiffs, is without costs.

